# EXHIBIT "A"

**THE LAW OFFICE OF JONATHAN RUDNICK, L.L.C.**
**ATTORNEY I.D. NO. 034721990**
**788 SHREWSBURY AVENUE**
**BUILDING 2, SUITE 204**
**TINTON FALLS, N.J. 07724**
**732-842-2070**
**FAX:  732-879-0213**

**DENNIS A. DRAZIN, ESQUIRE**
**ATTORNEY I.D. NO. 008101975**
**DRAZIN AND WARSHAW**
**25 RECKLESS PLACE**
**RED BANK, N.J. 07701**
**(732) 747-3730**
**FAX: 732-741-0865**
**ATTORNEYS FOR PLAINTIFF**

| | |
|---|---|
| **SHARON TAFARO, INDIVIDUALLY AND AS GUARDIAN AD LITEM FOR MINOR G      T** | **SUPERIOR COURT OF NEW JERSEY LAW DIVISION:OCEAN COUNTY** |
| **Plaintiffs,** | **DOCKET NO.  OCN – L – 1742-17** |
| **Vs.** | **CIVIL ACTION** |
| **SIX FLAGS  GREAT  ADVENTURE LLC, INTAMIN,  ROCKY  MOUNTAIN CONSTRUCTION    JOHN DOES 1-100, (said names being fictitious), INTERIDE LLC, INTAMIN LTD** | **FIRST AMENDED COMPLAINT AND JURY DEMAND** |
| **Defendants.** | |

THE LAW OFFICE OF JONATHAN RUDNICK, LLC
788 SHREWSBURY AVE, SUITE 204
TINTON FALLS, NJ  07724

The plaintiffs, Sharon Tafaro Individually and as Guardian Ad Litem for minor, G    T    , residing in Ocean County New Jersey States by way of complaint against the defendants as follows:

## COUNT I

1.      On or about July 12, 2016 the following defendants were corporations or limited liability companies, licensed to do business in the state of New Jersey: Six Flags Great Adventure LLC, John Does 1-10.

2.      Six Flags Great Adventure LLC, is a corporation and/or limited liability companies located in NJ and licensed to do business in New Jersey and were in control or and/or responsible for the park premises including, but not limited to, El Toro rollercoaster.

3.      It is believed and asserted that these corporate entities operated and otherwise controlled premises otherwise known as a Great Adventure doing business as an amusement park for which there is public access.

4.      On or about the aforementioned date the defendant corporation Intamin of Switzerland and/or John Does 1-100 (names being fictitious), Interide LLC, Intamin LTD, manufactured, designed and installed the ride located on the subject premises known as El Toro.

5.      The following is from Wikipedia

**El Toro, a Spanish term meaning The Bull, is a wooden roller coaster at Six Flags Great Adventure in Jackson, New Jersey. Designed by Intamin of Switzerland, it opened to the public on June 11, 2006. Intamin also worked with members of Rocky Mountain Construction to build the ride. When it opened, it had the steepest drop of any wooden roller coaster in the world at 76 degrees, until the record was broken by T Express in 2008 by one degree. Overall, its structure height of 181 feet (55 m) is**

THE LAW OFFICE OF JONATHAN RUDNICK LLC
788 SHREWSBURY AVE., SUITE 204
TINTON FALLS, NJ 07724

THE LAW OFFICE OF JONATHAN RUDNICK LLC
788 SHREWSBURY AVE. SUITE 204
TINTON FALLS, NJ 07724

**ranked fourth, its drop height of 176 feet (54 m) is ranked second, and its top speed of 70 miles per hour (110 km/h) is ranked fourth among all wooden roller coasters in the world. It was also the first wooden roller coaster to use a cable lift as opposed to the traditional chain lift.**

6.    El Toro suffered a malfunction with the lift motor in early August 2013. The motor was sent to Maryland to be fixed. El Toro re-opened on August 30, after it had been down for several weeks.

**7.**    Defendant(s) Intamin's first pre-fabricated wooden roller coaster, Colossos at Heide Park in Germany, has been shut down for the 2016 and 2017 seasons, and its future remains in doubt. Due to this, another of Intamin's pre-fabricated wooden coasters, T Express at Everland in South Korea, has also been closed for the 2017 season, leaving some to speculate the El Toro will also close at a date in the near future.  **See Exhibit "A".**

8.    The wooden track is approximately 4,400 feet (1,300 m) in length and the height of the lift is approximately 181 feet (55 m). El Toro is very different from a traditional wooden roller coaster because it uses prefabricated wooden track. It was built and designed by Intamin defendants but they also worked with members of Rocky Mountain Construction to build the ride. Instead of carpenters cutting, shaping, and laying down the track on site by hand, the track is laser cut in a factory. This means that the track is supposedly manufactured to a higher degree of precision than could be achieved by hand. The "Plug and Play" aspect of the coaster speeds construction of the coaster since track does not have to be completely manufactured on site. In addition, because of the speed of construction, the

costs of building the coaster are lowered due to fewer man-hours spent on the construction.

9.  El Toro is the first Intamin defendants "Plug and Play" wooden roller coaster in the United States and one of four in the world. The other three are Colossos at Heide Park in Germany, Balder at Liseberg in Sweden, and T Express at Everland in South Korea.

10. It is also believed and asserted that the defendant Rocky Mountain Construction Company participated in the construction of El Toro.

11. On or about July 12, 2016 the minor plaintiff was legally on the premises of the defendant having paid admission and entered the park and entered on to the ride known as El Toro.

12. The plaintiff, while on the ride, sustained serious and permanent injuries.

13. It is believed and asserted that the nature and extent of her injury was a direct and proximate result of various defects in the roller coaster El Toro.

14. El Toro was defective as manufactured, designed and installed in that the product as manufactured, designed and installed was not reasonably fit, suitable or safe for its intended purposes and the manufacturing and/or design defects rendered it unreasonably dangerous to members of the public, including but not limited to the plaintiff, which defects were the proximate cause of the plaintiff's injuries. The El Toro ride as designed and constructed was to be a smooth, safe ride but was exactly the opposite, rough and bumpy.

THE LAW OFFICE OF JONATHAN RUDNICK LLC
788 SHREWSBURY AVE, SUITE 204
TINTON FALLS, NJ 07724

15.  El Toro was improperly manufactured and/or designed by the defendant Intamin, Interide LLC, Intamin LTD and John Does 1-100 (said names being fictitious). The defective design existed when the product left said defendants control and the defect proximately caused the injuries sustained by the plaintiff, who was a reasonable, foreseeable user of the product.

16.  El Toro lacked proper warnings and/or had insufficient warnings by the defendants and John Does 1-100 (said names being fictitious) and failed to warn users such as the plaintiff, of the dangers of the product and the potentiality of the harm that could be caused thereby.

17.  El Toro was improperly manufactured and/or constructed by the defendants, including John Does 1-100 (said names being fictitious), which manufacturing and/or construction defects caused the injuries sustained by the plaintiff.

18.  El Toro was a defective product for which the plaintiffs have a claim under the New Jersey product liability laws. _N.J.S.A. 2A:58C-1 et seq_.

19.  The manufacturer, distributor, supplier and all defendants including John Does 1-100 (names being fictitious) are strictly liable under N.J.S.A. 2A:58C-1 et seq (Product Liability Act).

20.  As a direct and proximate result of the defects in the product as aforesaid, plaintiff sustained serious and debilitating injuries, had to seek medical attention to cure said injuries and was otherwise permanently disabled, for which the defendants are Strictly Liable in Tort.

THE LAW OFFICE OF JONATHAN RUDNICK LLC
788 SHREWSBURY AVE, SUITE 204
TINTON FALLS, NJ 07724

**WHEREFORE,** plaintiffs demand judgment against the defendants jointly, severally or in the alternative, for damages, together with interest, costs of suit and attorneys fees.

## COUNT II

21.     Plaintiffs repeat and reallege each and every allegation contained in the First Count of the Complaint as if set forth at length herein.

22.     At all times hereinafter mentioned, it is alleged that all of the defendants and John Does 1-100 (names being fictitious) negligently and improperly maintained the El Toro. As a direct and proximate result of the failure of the maintenance of same, plaintiff was caused to sustain serious and debilitating injuries, had to seek medical attention to cure said injuries and was otherwise permanently disabled and for which the defendants are strictly liable in Tort.

**WHEREFORE,** plaintiffs demand judgment against the defendants jointly, severally or in the alternative, for damages, together with interest, costs of suit and attorneys fees.

## COUNT III

23.     Plaintiffs repeat and reallege each and every allegation contained in the First and Second Counts of the Complaint as if set forth at length herein.

24.     The defendants Six Flags Great Adventure LLC., John Does 1-100 (names being fictitious) improperly operated the El Toro ride and/or failed to provide to its agents, servants, representatives and/or employees proper training,

THE LAW OFFICE OF JONATHAN RUDNICK LLC
788 SHREWSBURY AVE, SUITE 204
TINTON FALLS, NJ 07724

proper directions and/or proper supervision in connection with operating the El Toro, which led to the injures of the plaintiff.

25.     As a direct and proximate result of said negligence, defendants Six Flags Great Adventure LLC., and John Does 1-100 (names being fictitious) caused plaintiff to sustain serious and debilitating injuries, had to seek medical attention to cure said injuries and was otherwise permanently disabled.

**WHEREFORE,** plaintiffs demand judgment against the defendants jointly, severally or in the alternative for damages, together with interest, costs of suit and attorneys fees.

## COUNT IV

26.     Plaintiffs repeat and reallege each and every allegation contained in the First, Second and Third Counts of the Complaint as if set forth at length herein.

27.     After the plaintiff was injured she completed and signed the appropriate Paperwork at the amusement park at the aid station which she was required to do under the New Jersey Statutes. N.J.S.A.:3-57(a).

28.     In addition, the plaintiffs have notified the defendants by written correspondence after the incident consistent with New Jersey law. N.J.S.A.:3-57(a).

29.     It is believed that it is the obligation of the defendants, after receiving notice of the incident from the plaintiff, to shut down the ride and perform an investigation.

THE LAW OFFICE OF JONATHAN RUDNICK LLC
788 SHREWSBURY AVE, SUITE 204
TINTON FALLS, NJ 07724

30.     It is believed that the defendants failed to shut down the ride and conduct an investigation when they were required under New Jersey law to do so, as an affirmative duty.

31.     Further, that defendants are required to file an incident report with state agency subsequent to the plaintiff completing an incident report. N.J.S.A 5:3-39.

32.     The defendants have failed to complete and file an incident report with the state agency as required under New Jersey law. N.J.S.A. 5:3-47 and failed to shut down the ride and perform an investigation.

33.     It is believed and asserted that the defendants Six Flags Great Adventure LLC., and/or John Does 1-100 (names being fictitious) covered up the incident, covered up the severity of the plaintiff's injury and intentionally did not perform an investigation and intentionally did not file the appropriate paperwork under New Jersey law, which they are required to perform.

34.     This coverup has intentionally and willfully harmed the plaintiff with regard to the maintenance and investigative process which is established under New Jersey law.

35.     These acts of the defendants Six Flags Great Adventure LLC., and/or John Does 1-100 (names being fictitious), were done willfully, wantonly and with utter disregard for plaintiff's rights.

36.     This suggests that all of the defendants were aware of the severe danger involved in riding El Toro and failed to advise the public and specifically the plaintiff of such.

THE LAW OFFICE OF JONATHAN RUDNICK LLC
788 SHREWSBURY AVE, SUITE 204
TINTON FALLS, NJ 07724

37.     The plaintiff has been seriously permanently injured and has sustained severe emotional distress which is compensable under New Jersey law.

38.     The plaintiff will continue to sustain medical expenses into the near and distant future as a result of the nature and extent of her injury.

**WHEREFORE**, the plaintiff demands judgment against the defendants for damages jointly and severally together with interest, costs of the suit, compensatory damages, punitive damages and attorney fees.

## COUNT V

39.     Plaintiffs repeat and reallege each and every allegation contained in the First, Second, Third and Fourth Counts of the Complaint as if set forth at length herein.

40.     Plaintiff  Sharon Tafaro is the mother and guardian of the minor plaintiff, G        T

41.     As a direct and proximate result of the injuries sustained by the minor plaintiff, G        T        as set forth in the previous counts of this Complaint, Sharon Tafaro has been deprived of the services of her daughter, has had to expend monies and will continue to expend monies for her medical care and treatment and has otherwise suffered damages.

THE LAW OFFICE OF JONATHAN RUDNICK LLC
788 SHREWSBURY AVE., SUITE 204
TINTON FALLS, NJ 07724

**WHEREFORE**, the plaintiff Sharon Tafaro individually demands judgment against the defendants jointly, severally or in the alternative, for damages together with interest, costs of the suit.

## JURY DEMAND

Plaintiff hereby demands a trial by a jury as to all issues raised in these pleadings.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to the provisions of <u>R</u>. 4:25-4, the Court is advised that DENNIS A. DRAZIN, ESQ., is hereby designated trial counsel.

## CERTIFICATION

I hereby certify that, pursuant to <u>R</u>. 4:5-1(b)(2), this matter in controversy is not the subject of any other action pending in any Court or of a pending arbitration, nor is any action or arbitration proceeding contemplated.

BY: _____

JONATHAN RUDNICK, ESQ.

Dated:  July 25, 2017

THE LAW OFFICE OF JONATHAN RUDNICK LLC
788 SHREWSBURY AVE., SUITE 204
TINTON FALLS, NJ 07724



**Welcome To Screamscape!**
If you're a theme park lover or enjoy the best thrill rides the world has to offer, you've found the right place.

From new ride announcements, construction reports and the latest rumors; Screamscape always has something new to report.

G+1   0

**News & Rumors**

**HEIDE-PARK**
Germany
Merlin Entertainments Group



Home
North American Parks
International Parks
Park Links
Other Links
About Us
Contact Us
Features

**Newest Attractions:**
2014 - Flug der Dämonen

2013 - Nothing New

**Park News** - (3/17/17) In a somewhat shocking development Heide Park has announced that their massive Colossos wooden coaster (Intamin) will not be opening at all for the entire 2017 season. As seen on the Heide Park Report Facebook page, a large decorated construction fence has already been put up, blocking all access to the ride area.

So what happened to Colossos? From what Screamscape has heard, Germany's TÜV ordered the coaster shut down late last summer, as the ride experience had deteriorated to the point where it was clear something was wrong. According to one report, Colossos had simply become too rough, and not in the same way that you would expect a wooden coaster to get rough with age, but had evolved into an experience similar to having a jackhammer on your spine for the duration of the ride.

For those that may not know, Colossos represented the first version of a new experimental construction method for wooden coasters from Intamin. Instead of putting down layers of wood under the rails, these sections of the ride were each custom milled from large wooden blocks for each track section, had the custom designed rails mounted to them, and then delivered to the site ready for installation. The large wooden track sections are designed so they can be assembled together on site, almost like putting together a Lego model. (A photo showing off a couple of these can be found here.)

The idea was that down the line, when a section of the ride was in need of re-tracking, they could simply order the specific pieces needed and then swap them out, much like you would do with a steel coaster. As Colossos is the oldest of the four Intamin Pre-Fab wooden coasters, built to open in 2001, apparently we now know just how long this new design of track will last, as we've heard that Colossos is now in need of extensive re-tracking.

So what's the problem? It seems this is going to be one hell of an expensive job, and by the time the ride was closed last season the park had already committed their 2017 budget towards building the new Ghostbusters dark ride, and did not have the funds needed to also re-track Colossos for 2017, so it is expected that the park's 2018 attraction budget will be spent to fix Colossos at this time.

On a related note, I've also been told that T-Express at Everland in South Korea, the youngest of the four Intamin Pre-Fab coasters (opened in 2008) is now also listed as being closed on the park's website. While T-Express is probably just closed for regular maintenance, it does make me interesting in knowing how well it and the other two Intamin coasters (El Toro at Six Flags Great Adventure and Balder at Liseberg) are holding up as they age, and if any of them have had to under-go any track replacement over the years.

(8/18/16) Screamscape sources tell us that Colossos at Heide Park is closed for the rest of the season. According to our source, some major issues were discovered with the track that need to be addressed, which could involve replacing some sections of track entirely.

**2017 - Ghostbusters 5D - Confirmed** - (4/26/17) The new Ghostbusters 5D dark ride at Heide Park opened on April 11th, offering 3D imagery and ghost blasting laser pistols for those aboard the Ecto-X ride vehicle. The park sent out a great image as well showing off the great looking Ecto-X ride car.



(10/17/16) Heide Park will open a new Ghostbusters 5D attraction in 2017 according to this update. The new Ghostbusters attraction was just announced on Oct. 14th at the park and described as a dark ride style experience where guests ride in an ECTO-X car, armed with their own proton blaster to bust ghosts and their master Lord Explorus inside a mysterious warehouse. The park will actually put an existing structure to use to house the new dark ride inside the former 'Spencer Hall' building that was previously being used for a LEGO shop and a children's show.

**2018 - Refurbish Colossos - Rumor** - (3/17/17) The park is rumored to spend their 2018 capital budget on fixing and reopening the closed Colossos wooden coaster.



Copyright © 1996 - 2017 by Lance Hart & Screamscape.com.  All rights reserved.

Exhibit A

5/26/17, 3:18 PM

# EXHIBIT "B"

2017 WL 1836155
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court,
D. New Jersey.

CROWLEY, et al., Plaintiffs,
v.
SIX FLAGS GREAT
ADVENTURE, et al., Defendants.

Civil Action No. 3:14–cv–2433–BRM–TJB
|
Signed 05/08/2017

**Attorneys and Law Firms**

David P. Corrigan, Hobbie, Corrigan & Bertucio, PC, Eatontown, NJ, for Plaintiffs.

Heather M. Eichenbaum, Spector Gadon & Rosen, PC, Philadelphia, PA, for Defendants.

**OPINION**

HON. BRIAN R. MARTINOTTI, United States District Judge

**\*1** Before this court is Defendant Six Flags Great Adventure's ("Six Flags") Motion to Preclude Plaintiffs' Proposed Liability Expert and for Summary Judgment. (ECF No. 45–1.) Plaintiff opposed this motion (ECF No. 55) and the Court heard oral argument on the motion on December 5, 2016 pursuant to Federal Rule of Civil Procedure 78(a). For the reasons set forth below and for good cause having been shown, Six Flags' motion is **GRANTED in part** and **DENIED in part**.

**I. BACKGROUND**
Plaintiff Jonathon Crowley ("Crowley") (together with Jessica Crowley, "Plaintiffs") alleges to have suffered an injury involving the American Hi–Striker game (the "Game") at Six Flags, a game in which guests test their strength by swinging a rubber mallet to hit a strike pad, causing a LED tower to light up and ring a bell for prizes. Crowley, while playing the Game, injured himself when the rubber mallet bounced off the strike pad and hit him in the face. Plaintiffs alleged: (1) Six

Flags negligently caused operated and/or maintained the Game causing a dangerous condition (Count I); (2) Six Flags "negligently and defectively design[ed], manufactur[ed], repair[ed], refurbish[ed], recondition[ed], market[ed], s[old], or otherwise place[d] in the stream of commerce the [Game] causing [it] to be in a dangerous and unsafe condition" (Count II); (3) failure to warn (Count III) [1]; and (4) loss of consortium as to Jessica Crowley. (Compl. (ECF No. 1–1); *see* Pls.' Resp. to Def.'s Statement of Facts (ECF No. 48–3).)

Plaintiffs retained Mark T. Hanlon, P.E. of Hanlon Engineering PLLC as their liability expert. Mr. Hanlon is a registered licensed engineer and founder of his own engineering firm specializing in the design and development of new and existing amusement park rides and show equipment. (Cert. in Lieu of Aff. of Michael R. Hobbie, Esq., Ex. I (ECF No. 53–4).) Plaintiffs submitted Mr. Hanlon's expert report ("Hanlon Report") in which Mr. Hanlon opined Crowley's injuries were caused by a "weak link" in the Game's mechanism, describing the "check valve inside the shock absorber," which "regulates the flow of air and/or oil inside the shock" and "regulates the speed at which the shock can extend or retract." (*Id.*) Mr. Hanlon posited that the check valve failed, causing the springs inside the strike pad to "rapidly expand[ ] in an uncontrolled counter motion pushing the hammer back up with virtually the same speed, force and energy of [Crowley's] initial strike." (*Id.*) Mr. Hanlon continued:

> **\*2** It is my professional opinion with a reasonable degree of engineering certainty, that the failure of the [Game] which caused [Crowley's] injuries was a mechanical failure of the check valve within the shock absorber. This failure, while intermittent, would be easily detectable by routine, periodic maintenance checks which included as a minimum, performance verification of the mechanical elements in the [Game]. This failure was caused by heavy use of the device over time .... This mechanical failure is not related to the amount of force applied from the impact of the hammer, rather from the frequency of strikes over time.

Crowley v. Six Flags Great Adventure, Slip Copy (2017)

2017 WL 1836155

(*Id.*)

Six Flags objects to the production of Mr. Hanlon as an expert witness at trial; their primary objection being that the Hanlon Report and accompanying affidavit "provide little more than a recital of his personal opinions, unsupported by reasoning or reliable methodology." (ECF No. 45–1 at 14.) In support, Six Flags states: "Mr. Hanlon made no calculations of the forces involved and took no account of the effects of gravity, friction, the energy-absorbing characteristics of the spring, the striker pad, the rubber mallet head, or even an allegedly, non-functioning shock absorber ...." (ECF No. 45–1 at 14.)

It is undisputed that Mr. Hanlon did not inspect the Game. (ECF No. 48–3 ¶ 14; Mot. of Def. (ECF No. 45) ¶ 14.) Six Flags' expert, Ned R. Hansen, Ph.D., P.E., inspected the Game and found several discrepancies between Mr. Hanlon's description of the Game and the Game itself, most notably finding that the Game did not have a "check valve." (Mem. of Law in Supp. of Def.'s Mot., Ex. F (ECF No. 45–6) at 19–20.) Plaintiffs disagree, supported by Mr. Hanlon's Affidavit contending every shock absorber requires a check valve to function, even if the "check valve" is referenced by another name. (Aff. of Mark T. Hanlon, P.E. (ECF No. 48–4).)

Plaintiffs further argue Mr. Hanlon has specialized knowledge and experience in the field of amusement park operations and safety, beyond that of the average lay person, and is therefore qualified to testify. (Pls.' Mem. of Law in Opp. To Def.'s Mot. (ECF No. 48–1) at 14.) Additionally, Plaintiffs argue Mr. Hanlon's testimony is reliable because he reviewed the discovery available based on his specialized knowledge of the Game. (*Id.*) To that end, Plaintiffs note the lack of inspection records and fault Six Flags for failing to maintain same. (*Id.* at 16–18.) It is undisputed Six Flags are not in possession of any maintenance, repair, or inspection records for 2010 to 2013. (Hobbie Cert., Ex. C (ECF No. 52–3), at 63:5–21.)

Relatedly, Six Flags moves for summary judgment, arguing that Plaintiffs cannot establish Six Flags breached any duty if the Court finds Mr. Hanlon's expert testimony is precluded. Plaintiffs oppose the summary judgment motion, alleging Six Flags may be held liable on a theory of *res ipsa loquitur*, regardless of the admission of Mr. Hanlon's testimony.

## II. DECISION

### A. Admissibility of Mr. Hanlon's Expert Testimony

Admission of expert testimony is governed by Federal Rule of Evidence 702, which states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

**\*3** Fed. R. Evid. 702; *Buzzerd v. Flagship Carwash of Port St. Lucie, Inc.*, 397 Fed.Appx. 797, 799 (3d Cir. 2010).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the United States Supreme Court set forth factors to serve as guideposts for the district courts in determining the admissibility of expert scientific testimony. The factors have been summarized in this Circuit as follows: "(1) whether the methodology can and has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the known or potential rate of error of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 152 (3d Cir. 1999) (citing *Daubert*, 509 U.S. at 593–94.)

Additionally, and more recently, the Third Circuit supplemented the *Daubert* factors with three (3) additional factors a district court might use in evaluating expert testimony: qualifications, reliability, and fit. *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741–43 (3d Cir. 1994)); *Heller*, 167 F.3d at 152 (citing *Paoli*, 35 F.3d at 742 n.8). These factors, when evaluated, comprise and consider the *Daubert* factors and are therefore used in this District. *See Paoli*, 35 F.3d at 742.

**1. Qualifications**

"Qualification requires that the witness possess specialized expertise. [The Third Circuit] ha[s] interpreted this requirement liberally, holding that a broad range of knowledge, skills, and training qualify an expert as such." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003); *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (citing *Waldorf v. Shuta*, 142 F.3d 601 (3d Cir. 1998); *McGarrigle v. Mercury Marine*, 838 F. Supp. 2d 282, 289 (D.N.J. 2011).

Six Flags does not dispute Mr. Hanlon's qualifications (ECF No. 45–1, at 10), therefore the Court will proceed with the analysis.

**2. Reliability**

The Third Circuit instructs district courts to evaluate the proposed expert's methodology in its review of the testimony's reliability:

> [T]he testimony must be reliable. In other words, the expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief. An assessment of the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity.

*Calhoun*, 350 F.3d at 321; *McGarrigle*, 838 F. Supp. 2d at 289. Along with "any other[ factors] that are relevant," courts consider the following factors in determining the reliability of a proposed expert's testimony:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been

established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

**\*4** *Paoli*, 35 F.3d at 742 & n.8 (citing *Daubert*, 509 U.S. at 591 and *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985); *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 405 (3d Cir. 2003); *McGarrigle*, 838 F. Supp. 2d at 290.

Defendants contend Mr. Hanlon's opinion "is entirely unsupported by any objective methodology, calculations, or other scientific or otherwise reliable reasoning." (ECF No. 45–1 at 1.) On the other hand, Plaintiffs contend Mr. Hanlon relied on "the evidence, his knowledge of the [Game] and the [Game's] Owner's Manual, *as well as scientific principle* and his own training, experience and knowledge." (ECF No. 55 at 14 (emphasis added).) Specifically, Plaintiffs refer the Court to the following portion of the Hanlon Report:

> [Crowley's] case is a classic example of Newton's Third Law: Every action (Force) has an equal and opposite reaction (Counter–Force).
>
> The Monroe air shock incorporated in this design is composed of two basic components,
>
> 1. A shock absorber with an internal oil reservoir and check/control valve to restrict/regulate flow of the liquid when the show is either compressed or extended.
>
> 2. The air bag/pneumatic spring surrounding the shock.
>
> It is my professional opinion, with a reasonable degree of engineering certainty that on the date of the incident, there was a level of compressed air, by design, in the air bag creating a pneumatic spring, when the steel striker cap was hit with the hammer, the mechanical spring/air shock spring was compressed downward, once the force from the hammer strike was exhausted and the strike pad was fully compressed, the dual spring released its stored energy and pushed the striker cap upward, at this time the check valve inside the shock failed to perform and was unable to control/regulate the movement of the shock. Thus, all the force conveyed by the hammer into the striker cap was rebounded upward into the hammer

Crowley v. Six Flags Great Adventure, Slip Copy (2017)

2017 WL 1836155

causing the hammer to rapidly bounce up and injure to the patron [Crowley].

....

Consequently, in my opinion, with a reasonable degree of engineering certainty, the [Game] failure occurred as follows: when the "Strike Pad" was impacted by [Crowley]'s hammer strike, the "Strike Pad" cap was depressed, (pushed down), the energy from the hammer strike was then stored in the double spring mechanism, the control valve in the shock absorber failed, thus after the hammer was completed imparting its force (energy) compressing the "Strike Pad," the springs rapidly expanded in an uncontrolled counter motion pushing the hammer back up with virtually the same speed, force and energy of the initial strike. When [Crowley] had completed his swing of the hammer his body tilted forward and his head was close to the "Strike Pad." Therefore, he had no opportunity to avoid the hammer as it rapidly propelled upward by the unchecked spring.

(ECF No. 55 at 14–15 (quoting ECF No. 53–4).)

The Court is satisfied Mr. Hanlon's testimony is reliable. Mr. Hanlon relies on a well-known and well-tested scientific theory: Newton's Third Law. Six Flags argues this "middle school science" absent, at minimum, "calculations of the forces involved," among other factors, "serves more to confuse than enlighten the fact-finder." (ECF No. 45–1 at 14.) The Court disagrees. It is because this science is so widely accepted that its importance cannot be diminished or ignored by the Court. *See, e.g., Amadio v. Glenn*, Civ. A. No. 09–4937, 2011 WL 336721, at \*9 (E.D. Pa. Feb. 1, 2011) (finding expert's testimony reliable for its reliance on vector analysis or Newton's second law of motion). Therefore, Mr. Hanlon's testimony, based on a well-tested, generally accepted, valid scientific theory, is reliable. If Six Flags wishes to challenge Mr. Hanlon on his conclusions, it is permitted to do so on cross examination at trial. *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000) ("The analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination." (quoting *Kannankeril v. Terminix International Inc.*, 128 F.3d 802, 806 (3d Cir.1997))).

**3. Fit**

\*5  "[T]he expert testimony must fit, meaning the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Calhoun*, 350 F.3d at 321; *McGarrigle*, 838 F. Supp. 2d at 289; *see Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (listing the third requirement as "the expert's testimony must assist the trier of fact"). In other words, "the scientific knowledge must be connected to the question at issue." *Paoli*, 35 F.3d at 745 n.13; *McGarrigle*, 838 F. Supp. 2d at 293. "A court 'must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used.' " *Oddi*, 234 F.3d at 145 (citing *Heller*, 167 F.3d at 153); *McGarrigle*, 838 F. Supp. 2d at 293. Importantly, the Third Circuit "emphasize[d] that the standard [for fit] is not that high" but is "higher than bare relevance." *Paoli*, 35 F.3d at 745.

Six Flags argues Mr. Hanlon's testimony does not and cannot "fit" because

> Mr. Hanlon offers no evidence that the check valve in fact failed, <u>no</u> explanation as to how the check valve even could have failed, <u>no</u> calculations as to how such a failure could have resulted in this incident, and <u>no</u> explanation as to why negligence had to be involved —other than his own bare and personal conclusion that it must be so.

(ECF No. 55 at 18; *see id.* (quoting *Wilson v. Saint–Gobain Universal Abrasives, Inc.*, No. 213–cv–1326, 2015 WL 1499477 (W.D. Pa., April 1, 2015) ("Each of [the expert's] opinions as to possible defects ... depend on his own assumptions and lack a sufficient factual foundation in the record.").)

The Court disagrees with Six Flags' analysis. Mr. Hanlon's conclusions "could reliably flow from the facts known to [him] and the methodology used"—i.e., Newton's Third Law. *Oddi*, 234 F.3d at 145. Mr. Hanlon clearly explains in his report how the scientific knowledge relates to the Game, which the Court finds would assist the trier of fact, *Pineda*, 520 F.3d at 244; *Calhoun*, 350 F.3d at 321; *McGarrigle*, 838 F. Supp. 2d at 289:

Crowley v. Six Flags Great Adventure, Slip Copy (2017)
2017 WL 1836155

[Crowley's] case is a classic example of Newton's Third Law: Every action (Force) has an equal and opposite reaction (Counter–Force).

....

[A]ll the force conveyed by the hammer into the striker cap was rebounded upward into the hammer causing the hammer to rapidly bounce up and injure to the patron [Crowley].

....

[I]n my opinion, with a reasonable degree of engineering certainty, the [Game] failure occurred as follows: when the "Strike Pad" was impacted by [Crowley]'s hammer strike, the "Strike Pad" cap was depressed, (pushed down), the energy from the hammer strike was then stored in the double spring mechanism, the control valve in the shock absorber failed, thus after the hammer was completed imparting its force (energy) compressing the "Strike Pad," the springs rapidly expanded in an uncontrolled counter motion pushing the hammer back up with virtually the same speed, force and energy of the initial strike. When [Crowley] had completed his swing of the hammer his body tilted forward and his head was close to the "Strike Pad." Therefore, he had no opportunity to avoid the hammer as it rapidly propelled upward by the unchecked spring.

(ECF No. 53–4 at 8–10.)

Accordingly, Mr. Hanlon's testimony is fit for the purpose of determining admissibility and, as such, is entirely admissible following the Court's findings above that he is not precluded by the "trilogy of restrictions on expert testimony." *Calhoun*, 350 F.3d at 321. Six Flags' Motion to Preclude is **DENIED**.

**B. Summary Judgment**
Federal Rule of Civil Procedure 56(c) governs summary judgment motions and states: "Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing no genuine issue exists as to any material fact

then, if met, the nonmoving party must "come forward with 'specific facts showing there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10, 587 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). A fact is "material" if its existence or nonexistence affects the outcome of the suit, and a dispute is "genuine" if a reasonable fact finder could return a verdict in favor of the nonmoving party. *Anderson*, 477 U.S. at 248, 252. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.... If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249 (internal citations omitted).

**\*6** Therefore, the Court must look to claims at issue. Crowley alleges [2]: (1) Six Flags negligently caused operated and/or maintained the Game causing a dangerous condition (Count I); (2) Six Flags "negligently and defectively design[ed], manufactur[ed], repair[ed], refurbish[ed], recondition [ed], market[ed], s[old], or otherwise place[d] in the stream of commerce the [Game] causing [it] to be in a dangerous and unsafe condition" (Count II); and (3) failure to warn (Count III). As to the first two negligence claims, Plaintiffs maintain they can, in the alternative, be proved by a theory *res ipsa loquitor.*

**1. Res Ipsa Loquitur**
Plaintiffs maintain their cause of action may proceed on a theory of *res ipsa loquitur* even if Mr. Hanlon's testimony is precluded. Although Mr. Hanlon's testimony is admissible, the Court finds Plaintiffs may not proceed on this theory.

*Res ipsa loquitur* is a theory of proving negligence by circumstantial evidence, providing the Court with an "evidentiary rule that governs the adequacy of evidence in some negligence cases." *Myrlak v. Port Authority of New York and New Jersey*, 157 N.J. 84, 95 (1999). An inference of negligence is permitted where: "(a) the occurrence itself ordinarily bespeaks negligence; (b) the instrumentality was within the defendant's exclusive control; and (c) there is no indication in the circumstances that the injury was the result of the plaintiff's own voluntary act or neglect." *Id.* (quoting *Bornstein v. Metropolitan Bottling Co.*, 26 N.J. 263, 269 (1958)); *Jerista v. Murray*, 185 N.J. 175, 192

Crowley v. Six Flags Great Adventure, Slip Copy (2017)
2017 WL 1836155

(2005) (quoting *Buckelew v. Grossbard*, 87 N.J. 512, 525 (1981) and *Bornstein*, 26 N.J. at 269)). Plaintiff must prove all of these elements by a preponderance of the evidence. *Szalontai v. Yazbo's Sports Café*, 183 N.J. 386, 389 (2005); *see Myrlak*, 157 N.J. at 96.

Plaintiffs have not met their burden in showing Six Flags should be found liable under a theory of *res ipsa loquitur*. The Game was not within the Six Flags' exclusive control at the time of Crowley's injury. Rather, Crowley was in control of the Game. The Court notes Plaintiffs' argument that the "instrumentality" was the shock absorber rather than the mallet, but finds Crowley's use of the game at the time of his injury is sufficient to reject a *res ipsa loquitur* theory of liability.

Accordingly, Plaintiffs may not proceed on a theory of *res ispa loquitur*.

### 2. Negligence (Counts I & II)

In order for Plaintiffs to set forth a negligence claim, they must prove: (1) Six Flags owed Plaintiffs a duty of care; (2) Six Flags breached that duty; and (3) as a direct and proximate result of Six Flags' breach, Plaintiffs suffered injuries. *Endre v. Arnold*, 300 N.J. Super. 136, 142 (App. Div. 1997).

Six Flags moves for summary judgement on the presumption that Mr. Hanlon's testimony is inadmissible:

> Summary Judgment must be granted because, without a liability expert, plaintiffs do not have evidence to establish the breach of any alleged duty to protect Mr. Crowley from the harm claimed in this matter.... Therefore plaintiffs are required to prove a prima facie case of negligence, which they cannot do without a proper expert.

(ECF No. 45–1 at 21.)

Having permitted Mr. Hanlon's testimony, the Court sees no reason proffered by Six Flags to grant summary judgment as a matter of law on the negligence claims.[3] Accordingly, Six Flags' Motion for Summary Judgment is **DENIED** as to the negligence claims (Counts I & II).

### 3. Failure to Warn (Count III)

**\*7** The New Jersey Products Liability Act, N.J.S.A. §§ 2A: 58C–1, *et seq.* ("PLA") provides plaintiffs with the sole cause of action to prosecute a product liability claim. *Tirrell v. Navistar Int'l, Inc.*, 248 N.J. Super. 390, 398–99 (App. Div. 1991). The PLA specifically defines a "product liability action" to mean "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory of the underlying claim, except for harm caused by breach of an express warranty." N.J.S.A. § 2A:58C–1. Thus, the PLA subsumes independent failure to warn claims. *See Koruba v. Am. Honda Motor Co., Inc.*, 396 N.J. Super. 517, 531 (App. Div. 2007).

The PLA provides three ways in which plaintiff can prove a product was defective. N.J.S.A.§ 2A:58C–2. One method specifically relates to defendant's failure to warn:

> A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: a. deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or b. **failed to contain adequate warnings or instructions**, or c. was designed in a defective manner.

*Id.* (emphasis added).

New Jersey courts have interpreted the PLA's failure to warn cases as a claim that "the defect is in the failure to warn unsuspecting users that a product can potentially cause injury." *Zaza v. Marquess & Nell, Inc.*, 144 N.J. 34, 57 (1996); *Coffman v. Keene Corp.*, 133 N.J. 581, 594–95 (1993). Stated another way, defendant's duty to warn under the PLA "is premised on the notion that a product is defective absent an adequate warning for foreseeable users that the product can potentially cause injury." *Gendelman v. Blumenstein*, Civ. A. No. 12–6976, 2015 WL 3489883,

at *4 (D.N.J. June 2, 2005) (internal quotation marks omitted).

Importantly, the PLA only permits its failure to warn claims to proceed against a manufacturer, distributor, or seller of a product. N.J.S.A.§ 2A:58C–2. The claims cannot proceed against parties that did not manufacture or sell the product. *Id.* Amusement park owners do not constitute manufacturers of sellers of the product. *Morgan v. Six Flags Great Adventure*, 2013 WL 2300979 (App. Div. May 28, 2013); *Doerflein v. Six Flags Great Adventure*, 2006 WL 392980 (App. Div. Feb. 22, 2006).

Plaintiffs' failure to warn claim, which was brought independently of the PLA, must be dismissed. Even if Plaintiffs were to proceed under the PLA, their failure to warn claim would fail because Six Flags is not a product seller within the scope of the PLA. Courts have consistently held that amusement park owners do not constitute designers, sellers, or manufacturer of their amusement rides, and therefore cannot be held liable under PLA failure to warn theory of liability. *See* N.J.S.A.§ 2A:58C–2; *Morgan*, 2013 WL 2300979; *Doerflein*, 2006 WL 392980.

Accordingly, Six Flags' Motion for Summary Judgment is **GRANTED** as to Plaintiffs' failure to warn claim (Count III).

## III. CONCLUSION

For the reasons set forth above, Six Flags' Motion to Preclude Plaintiffs' Proposed Liability Expert is **DENIED**, and Six Flags' Motion for Summary Judgment is **GRANTED** as to Count III and **DENIED** as to Counts I, II, and IV. Further, Plaintiffs may not proceed on a theory of *res ipsa loquitor* at trial.

## All Citations

Slip Copy, 2017 WL 1836155

### Footnotes

1   The parties dispute Six Flags' knowledge of the Game's alleged malfunction. Plaintiffs alleged a Six Flags' staff member told them of additional injuries caused by the Game prior to Crowley's injury. Crowley indicated this information on his accident report filed with and signed by the staff member. The staff member, when deposed, denied making such a statement but admitted to signing the accident report despite it containing "false information." Defendants allege this dispute is not material because Plaintiffs provide no citations to the record. (ECF No. 55 at 2; Pls.' Statement of Material Fact (ECF No. 55–1) ¶ 13; Def.'s Resp. to Pls.' Statement of Material Fact (ECF No. 60) ¶ 13.)

2   Plaintiffs allege a fourth claim as to Jessica Crowley for loss of consortium (Count IV) (ECF No. 1–1) which the parties do not raise in this motion.

3   Even so, Plaintiffs have met their burden in demonstrating genuine issues of material fact exists. Most significantly, a genuine issue exists as to whether Defendant had notice of any alleged malfunction or whether the Game had a "check valve," which is alleged to be the malfunctioning piece. Where material issue of fact exist, the Court cannot grant summary judgment. *Anderson*, 477 U.S. at 248, 249–52.

---

End of Document                                      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "C"

Morgan v. Six Flags Great Adventure, L.L.C., Not Reported in A.3d (2013)

2013 WL 2300979

2013 WL 2300979
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of New Jersey,
Appellate Division.

Lisha Loo MORGAN and Raymond
Morgan, Plaintiffs–Appellants,
v.
SIX FLAGS GREAT ADVENTURE, L.L.C., t/a Six
Flags Hurricane Harbor, Defendant–Respondent.

Argued Sept. 20, 2012.
|
Decided May 28, 2013.

On appeal from the Superior Court of New Jersey, Law
Division, Ocean County, Docket No. L–1571–10.

**Attorneys and Law Firms**

Richard B. Ansell argued the cause for appellants (Ansell,
Grimm & Aaron, P.C., attorneys; Mr. Ansell, of counsel
and on the brief; Kristine M. Bergman, on the brief).

Douglas D. Suplee argued the cause for respondent
(Marshall, Dennehey, Warner, Coleman & Goggin,
attorneys; Mr. Suplee, on the brief).

Before Judges AXELRAD and NUGENT.

**Opinion**

PER CURIAM.

*1 Plaintiffs, Lisha Loo Morgan and Raymond Morgan,
appeal from the Law Division order that granted
summary judgment to defendant, Six Flags Great
Adventure, L.L.C., and dismissed their personal injury
and product liability complaint with prejudice.[1] We
affirm.

Construed in the light most favorable to plaintiff, *Brill v.
Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540 (1995), the
evidence on the motion record established the following
facts. On August 16, 2009, plaintiff and other members of
her family visited defendant's amusement park in Jackson

Township. While riding a water slide called "The Big
Bamboo" with her daughter and granddaughter, plaintiff
fractured her fifth left metatarsal.[2]

Plaintiff described the "The Big Bamboo" as a large yellow
raft, with handles on each side, that goes down a slide.
She and her daughter and granddaughter climbed stairs to
the top of the slide and then sat in the raft in a circle. An
attendant instructed them to sit in the raft with their legs
crossed under them, "like Indian style," and to hold onto
the handles on "both sides, left and right."

Once the three were positioned in the raft according to the
attendant's instructions, the attendant pushed the raft "to
go through the tunnel, the slide." Plaintiff described how
she was injured:

> And we're swooshing back and
> forth, we're coming down and we
> come down and the raft went
> airborne and when it came down at
> the end of the tunnel that's when
> my foot—at the edge, that's when
> the raft came down, at the edge and
> that's how I fractured my foot[.]

Plaintiff further explained that after the raft became
airborne, part of it came down on the edge of the slide,
rather than entirely in the splash pool. Her left foot was
"sandwiched" between the slide and her body weight.

Plaintiff filed a complaint alleging that defendant
designed, manufactured, operated, and maintained The
Big Bamboo in a negligent and careless manner, and failed
to warn plaintiff of the risks associated with using the
ride (first count); and designed, manufactured, assembled,
sold, and installed the ride in violation of New Jersey's
Product Liability Act (PLA), *N.J.S.A.* 2A:58C–1 to –11
(second count). Plaintiff's husband asserted a per quod
claim (third count).

Plaintiff neither inspected the ride nor retained an
expert during the discovery period. After the period
for discovery ended, defendant moved for summary
judgment. Following oral argument, Judge Rochelle
Gizinski delivered her decision from the bench, granting
defendant's summary judgment motion.

Citing the PLA's definition of a product liability action
as "any claim or action brought by a claimant for

Morgan v. Six Flags Great Adventure, L.L.C., Not Reported in A.3d (2013)

2013 WL 2300979

harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty[,] *N.J.S.A.* 2A:58C–1," and determining that plaintiff's action was a product liability action, Judge Gizinski concluded the PLA provided the exclusive remedy for plaintiff's injury. The judge explained that because defendant did not design, manufacture, or sell the ride, but merely sold licenses for admissions to its premises, it was not a proper defendant under the PLA. Additionally, the judge explained that the PLA and cases interpreting it prohibited negligence claims based upon the absence of warnings against entities that had not manufactured or sold a product. Lastly, Judge Gizinski concluded that, even if plaintiff's cause of action were not precluded by the PLA, defendant breached no duty to plaintiff.

**\*2** On appeal, plaintiff argues:

*POINT I*

THE MOTION JUDGE ERRED IN DETERMINING THAT DEFENDANT–APPELLANT DID NOT HAVE A DUTY TO WARN PLAINTIFF–APPELLANT OF THE DANGERS OF RIDING ITS WATER SLIDE.

*POINT II*

THE DEFENDANT HAD A DUTY TO PROVIDE WARNINGS TO ITS PATRONS THAT THEIR NON–NEGLIGENT RIDING OF A RIDE COULD NEVERTHELESS RESULT IN SERIOUS BODILY INJURY, AS WAS SUSTAINED BY THE PLAINTIFF–APPELLANT HEREIN.

*POINT III*

THE ISSUES PRESENTED IN THIS CASE DO NOT REQUIRE NOR WARRANT EXPERT TESTIMONY.

*POINT IV*

THE MOTION COURT'S ENTRY OF SUMMARY JUDGMENT WAS ERROR, AS HAVING BEEN PREDICATED UPON ISSUES OF FACT DECIDED AS A MATTER OF LAW.

The summary judgment standard is set forth in *Brill, supra,* 142 *N.J.* at 540. The motion judge must determine whether the competent evidential materials, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party. *R.* 4:46–2(c); *Brill, supra,* 142 *N.J.* at 540. When a party appeals from a trial court order granting a summary judgment motion, we " 'employ the same standard [of review] that governs the trial court.' " *Henry v. N.J. Dep't of Human Servs.,* 204 *N.J.* 320, 330 (2010) (quoting *Busciglio v. DellaFave,* 366 *N.J.Super.* 135, 139 (App.Div.2004)).

Having considered plaintiff's arguments and the record under that standard, we affirm substantially for the reasons stated by Judge Gizinski in her oral decision. Plaintiff's arguments do not warrant further discussion in a written opinion. *R.* 2:11–3(e)(1)(E).

Affirmed.

**All Citations**

Not Reported in A.3d, 2013 WL 2300979

---

Footnotes

1    In the complaint, Lisa Loo Morgan alleged that she was injured on one of defendant's rides. Raymond Morgan filed a per quod claim. For ease of reference, we refer to Lisha Loo Morgan as "plaintiff."

2    "[T]he fifth metatarsal [is] the long bone on the outside of the foot that connects to the little toe." *Fractures of the Fifth Metatarsal,* American College of Foot and Ankle Surgeons, http://www.foothealthfacts.o rg/footankleinfo/fifth-metatarsal —fractures.htm (last visited May 20, 2013).

---

End of Document

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "D"

Doerflein v. Six Flags Great Adventure, Not Reported in A.2d (2006)

2006 WL 392980

KeyCite Yellow Flag - Negative Treatment

Distinguished by Guillen v. Six Flags Great Adventure, LLC, D.N.J., December 29, 2015

2006 WL 392980

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of New Jersey,
Appellate Division.

Fred DOERFLEIN, Plaintiff–Appellant,
v.
SIX FLAGS GREAT ADVENTURE,
Defendant–Respondent,
and
Arrow Dynamics, Inc., Defendant.

Argued Sept. 27, 2005.
|
Decided Feb. 22, 2006.

**Synopsis**

**Background:** Amusement park patron who was allegedly injured while on ride brought personal injury and products liability claims against amusement park. The Superior Court, Law Division, Monmouth County, granted summary judgment in favor of amusement park. Patron appealed.

**Holdings:** The Superior Court, Appellate Division, held that:

[1] amusement park complied with statutory obligation to conspicuously post notices of requirement that an injured person file an accident report as a precondition to commencing litigation for personal injury;

[2] complaint did not fulfill statutory requirement that injured person file accident report; and

[3] amusement park was not a "product seller" for purposes of Products Liability Act.

Affirmed.

**West Headnotes (3)**

[1]   **Public Amusement and Entertainment**
       ⟜ Actions

Amusement park complied with statutory obligation to conspicuously post notices of requirement that an injured person file an accident report with the operator of the park as a precondition to commencing litigation for personal injury; signs were posted in six locations, including the two main entrances, the main exit, the overflow exit, and two first aid offices. N.J.S.A. 5:3-57(a), 5:3-57(c).

Cases that cite this headnote

[2]   **Public Amusement and Entertainment**
       ⟜ Actions

Amusement park patron's personal injury complaint did not fulfill statutory requirement that injured person either file a report of injury or file a motion for leave to extend period for filing report, as a precondition to commencing litigation for personal injury. N.J.S.A. 5:3-57(a), 5:3-58.

Cases that cite this headnote

[3]   **Products Liability**
       ⟜ Services as distinguished from products
      **Products Liability**
       ⟜ Warnings or Instructions
      **Products Liability**
       ⟜ Persons Liable
      **Products Liability**
       ⟜ Athletic and recreational equipment, in general;toys and games
      **Public Amusement and Entertainment**
       ⟜ Amusement rides and devices

Amusement park which operated ride on which patron was allegedly injured was not a "product seller" for purposes of provision of Products Liability Act imposing strict liability on a product seller if manufacturer has no

attachable assets; park provided a service which incidentally included allegedly defective ride. N.J.S.A. 2A:58C–8, 2A:58C–9(c)(3).

3 Cases that cite this headnote

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L–5229–01.

**Attorneys and Law Firms**

Robert B. Woods, argued the cause for appellant.

Walter F. Kawalec, III argued the cause for respondent (Marshall, Dennehey, Warner, Coleman & Goggin, attorneys; Mr. Kawalec, on the brief).

Before Judges LEFELT, HOENS and R.B. COLEMAN.

**Opinion**

PER CURIAM.

**\*1** Plaintiff Fred Doerflein appeals from the August 25, 2004 order of the Law Division granting summary judgment in favor of defendant Six Flags Great Adventure and dismissing his personal injury and products liability complaint. We affirm.

The following facts are relevant to the issues advanced on appeal. On May 28, 2001, plaintiff and his wife visited an amusement park owned and operated by defendant Six Flags. One of the rides that was operating that day was the "Great American Scream Machine," an amusement ride designed, manufactured and distributed by defendant Arrow Dynamics, Inc. Plaintiff asserts that he was injured when his head was thrown from side to side while he was on the ride. He was aware that he had been injured as soon as he left the ride and immediately told his wife that he had been hurt. He was not aware at the time of the extent of his injury. Plaintiff did not report the incident to anyone at the amusement park either on the day it happened or at any time prior to filing his complaint in the Law Division on November 1, 2001.

Plaintiff's original complaint asserted that defendant Six Flags was negligent in its operation of the ride on which he had been injured. Plaintiff filed his amended complaint in August 2002, adding defendant Arrow Dynamics and

asserting products liability claims against that entity as the designer, manufacturer and distributor of the ride on which he was injured. The amended complaint asserted the products liability theories against defendant Six Flags as well. In October 2002, plaintiff was advised that defendant Arrow Dynamics was involved in a bankruptcy proceeding in Utah. Plaintiff did not attempt to file a claim against defendant Arrow Dynamics in the Bankruptcy Court. Concluding, instead, that further litigation against that entity would violate the automatic stay provisions of the Bankruptcy Act, *see* 11 *U.S.C.* § 362(a), plaintiff proceeded to litigate his claims, including his products liability theory of recovery, against defendant Six Flags alone.

On August 25, 2004, the Law Division judge granted defendant Six Flags' motion for summary judgment as to all counts of the complaint for reasons he expressed on the record on August 24 and August 25, 2004.

On appeal, plaintiff argues that the judge erred in his analysis of the requirements of the Carnival–Amusement Rides Safety Act (CARSA), *N.J.S.A.* 5:3–31 to –59, and in his interpretation of the Products Liability Act, *N.J.S.A.* 2A:58C–1 to –11. Specifically, plaintiff argues that the judge erred in failing to find that the complaint itself complied with CARSA's statutory requirement of notice and in rejecting his assertion that the signs posted by defendant Six Flags were not sufficiently conspicuous. In addition, he argues that the judge erred in analyzing the products liability claim by failing to conclude that defendant Six Flags is liable to him for the injuries he sustained on the ride as the seller of the product of defendant Arrow Dynamics, its bankrupt manufacturer.

**\*2** CARSA governs the operation of all carnival and amusement rides in New Jersey. It requires that an injured person file an accident report with the operator of the park as a precondition to commencing litigation for personal injury. *N.J.S.A.* 5:3–57a. The statute requires each amusement park to maintain one or more designated locations to facilitate the filing of the reports, specifies the appropriate level of staffing for the office where the reports are filed and describes the manner of identifying the location of the place designated for filing reports. *N.J.S.A.* 5:3–57b.

CARSA also requires that the accident report be in writing, that it include specific information, and that

Doerflein v. Six Flags Great Adventure, Not Reported in A.2d (2006)

2006 WL 392980

the report be filed with the park operator within ninety days from the time of the incident leading to the injury. *N.J.S.A.* 5:3–57a, –57c. The statute further provides, however, that the ninety-day notice period may be extended to permit filing of the report within one year of the accident. *N.J.S.A.* 5:3–58. That extension may be granted by a judge, based upon a motion demonstrating "sufficient reason" for failing to file the report, and upon a finding that the operator of the park is not "substantially prejudiced" by that failure. *Ibid* .

[1]   CARSA requires the park operator to conspicuously post notices of the reporting requirement and specifies the contents of the notices and locations where the notices must be posted. *N.J.S.A.* 5:3–57a, –57c. It is undisputed that the defendant Six Flags posted the required notices and maintained an office to facilitate the filing of the accident reports as required by the statute.

The evidence of defendant Six Flags' compliance with the number and placement of the required signs is undisputed. Indeed, plaintiff's argument about the signs was that they must not have been conspicuous because he stayed at the park for several hours and did not see them. We decline plaintiff's implicit invitation to adopt a subjective standard for conspicuousness in place of compliance with the statute itself.

At the time of plaintiff's visit to the amusement park, it is undisputed that the signs were posted in six locations, including the two main entrances, the main exit, the overflow exit, and two first aid offices. Each sign included an explanation of the reporting requirement under the statute. *See N.J.S.A.* 5:3–57, –58. It is also undisputed that the signs had been inspected by representatives of the Department of Community Affairs.[1] There is, in short, no evidence in the record to suggest that defendant Six Flags failed to comply with the requirement that it post signs that were both conspicuous in place and number so as to satisfy the statutory prerequisite to the reporting requirement.

[2]   Plaintiff further asserts that the motion judge erred in failing to permit his complaint to serve as the functional equivalent of the motion for leave to extend the notice period. He relies on this court's discussion of the motion requirement in *Lopez v. Gillian's Pier,* 359 *N.J.Super.* 410, 820 A.2d 100 (App.Div.), *certif. denied,* 172 *N.J.* 496 (2003), for support. We disagree, however, with plaintiff's

analysis. Our discussion in *Lopez* of the relationship between the one-year window for filing the motion and the discovery rule, *id.* at 413–15, 820 A.2d 100, does not support plaintiff's argument that filing a complaint to commence litigation supplants the requirement that one file a motion or that one seek leave by way of motion to file a late notice.

**\*3** Plaintiff has never filed a notice relating to his injury. Although he filed his complaint within one year of the date on which he asserts he was injured, by failing to seek leave as the statute requires, he effectively deprived the judge of the opportunity to exercise the discretion granted by the statute itself to evaluate whether the park operator had suffered prejudice as a result of the delay. *See N.J.S.A.* 5:3–58. We find no basis on which to conclude that the filing of a complaint fulfills the statutory requirement that the injured party either file the report of injury or timely file a motion for leave.

[3]   Finally, plaintiff asserts that the judge erred in his analysis of the products liability claim. He contends that defendant Arrow Dynamics, the designer, manufacturer and distributor of the ride on which he was injured, is bankrupt and that defendant Six Flags therefore stands in the shoes of that entity as the seller of the ride. *See N.J.S.A.* 2A:58C–9a, –9c(3). We disagree with plaintiff's analysis for two reasons.

First, the evidence in the record only demonstrates that defendant Arrow Dynamics was involved in bankruptcy proceedings in or around October 2002. There is no evidence establishing, however, that Arrow "has no attachable assets or has been adjudicated bankrupt and a judgment is not otherwise recoverable from the assets of the bankruptcy estate" as required under our Products Liability Act as a threshold for relief against another potentially responsible entity. *See N.J.S.A.* 2A:58C– 9c(3).[2]

Second, however, the Products Liability Act itself defines a product seller for purposes of liability so as to explicitly exclude an entity, like defendant Six Flags, which provides a service "in which the sale or use of a product is incidental to the transaction and the essence of the transaction is the furnishing of judgment, skill or services." *N.J.S.A.* 2A:58C–8. As we have recently decided, a trucking company is not liable as a seller of a tire it sent for retreading, *see Becker v. Tessitore,* 356 *N.J.Super.* 233,

235, 812 A.2d 369 (App.Div.2002), a motel owner is not liable to a guest for a defective cooking utensil supplied in the motel room, *see Ranalli v. Edro Motel Corp., 298 N.J.Super.* 621, 624–25, 690 A.2d 137 (App.Div.1997), and a bowling alley operator is not liable to a patron injured by a bowling ball supplied to that patron by the operator of the bowling alley, *see Dixon v. Four Seasons Bowling Alley, Inc.,* 176 N.J.Super. 540, 546–47, 424 A.2d 428 (App.Div.1980). In each of these instances, the entity provided a service which incidentally included the defective product. In each of these matters, we rejected the argument that the entity fell within the definition of a seller. We find no ground in this record on which to reach a contrary conclusion.

Affirmed.

**All Citations**

Not Reported in A.2d, 2006 WL 392980

Footnotes

1    Regulations adopted with an effective date of December 16, 2002, relating to carnival amusement rides, *see N.J.A.C.* 5:14A–1 .1 to –13.15, were not in effect at the time of plaintiff's visit to the park and thus are not relevant to our analysis. To the extent that these regulations might be of assistance to our analysis, we note that they do not define conspicuousness.

2    At oral argument counsel for defendant Six Flags asserted that the bankruptcy proceeding as against Arrow Dynamics remained unresolved even as recently as September 2005, with the implication that plaintiff might be able to assert a claim in that forum. We need not consider this assertion, however. Regardless of the status of the bankruptcy proceeding, plaintiff has not produced evidence that would satisfy the statutory threshold for relief against defendant Six Flags in place of defendant Arrow Dynamics.

End of Document                              © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "E"

2015 WL 3489883
Only the Westlaw citation is currently available.
United States District Court,
D. New Jersey.

Robert GENDELMAN, Plaintiff,
v.
Tracey J. BLUMENSTEIN; Professional
Boat Sales, Service & Storage, LLC; and
Cigarette Racing Team, LLC, Defendants.

Civil Action No. 12–6976 (JEI).
|
Signed June 2, 2015.

**Attorneys and Law Firms**

Geoffrey B. Gompers, Esq., Moorestown, Moorestown,
NJ, for Plaintiff.

Jeffrey R. Lessin & Associates PC, by: Jeffrey R. Lessin,
Esq., Philadelphia, PA, for Plaintiff.

Hill Rivkins LLP, by: Michael D. Wilson, Esq., New
York, NY, for Defendants Tracey J. Blumenstein and
Professional Boat Sales, Service & Storage, LLC.

Marshall Dennehey Warner Coleman & Goggin, PC, by:
Christopher B. Block, Esq., Roseland, NJ, for Defendant
Cigarette Racing Team, LLC.

**OPINION**

IRENAS, Senior District Judge.

**\*1** On September 19, 2011, Defendant Tracey
Blumenstein ("Blumenstein") was operating a 37.5 foot
Top Gun Model Cigarette boat (the "Vessel") in Ships
Channel in Egg Harbor Township, New Jersey, with
passengers Plaintiff Robert Gendelman ("Plaintiff") and
non-party Andrew Biddle. (Cigarette Racing Team LLC's
("Cigarette") Statement of Material Facts Not in Dispute,
Dkt. No. 67–4 ("CSOF") ¶ 1; Blumenstein Defs.' Br. Opp.
Cigarette's Mot. for Summ. J., Dkt. No. 77 ("Blumenstein
Opp. Br.") at 5) When Blumenstein attempted to make
a turn, the Vessel flipped and capsized, and all three
individuals were ejected from the Vessel. (*Id.*)

Plaintiff sustained injuries and on November 9, 2012, filed
a Complaint, Dkt. No. 1 ("Compl.") against Blumenstein
and his company Professional Boat Sales, Service
& Storage LLC ("PBS") (collectively "Blumenstein
Defendants"). [1]  In response to discovery that followed, [2]
Plaintiff amended his Complaint on August 8, 2013, to
add Cigarette, the Vessel's designer and manufacturer, as
a defendant. (Pl.'s First Mot. for Leave to File an Am.
Compl., Dkt. No. 16 at ¶¶ 6–10; Amended Complaint,
Dkt. No. 21 ("Am.Compl."))

Plaintiff alleges strict liability and negligence, each
under both state and federal admiralty law, and breach
of warranty against Cigarette. (Am.Compl.¶¶ 26–63)
Blumenstein Defendants also bring cross-claims against
Cigarette for strict liability, negligence, and breach of
warranty. (Defs. Answer and Cross–Claims, Dkt. No. 26
at 8–13) Presently before the Court is Cigarette's Motion
for Summary Judgment, Dkt. No. 67 ("CMSJ").

Only Blumenstein Defendants filed an opposition brief
to Cigarette's motion ("Blumenstein Opp. Br."). Plaintiff
represented to the Court during a teleconference on
February 24, 2015, and during oral argument on March
2, 2015, that he did not oppose Cigarette's motion,
did not intend to file an opposition brief, and did
not blame Cigarette for Plaintiff's injuries, emphasizing
instead his personal belief that Blumenstein alone was
at fault for the accident. Plaintiff has since attempted to
join Blumenstein Defendants' opposition to Cigarette's
motion via Letter–Brief dated March 13, 2015, Dkt.
No. 99 ("Pl.Ltr.-Br."). The Court does not recognize
this delayed attempt at opposition, which contradicts
Plaintiff's previous statements, particularly given that
Plaintiff continues to say that he does not personally
believe Blumenstein Defendants' "dubious" arguments.
(Pl. Ltr.-Br. at 4, 1–2)

During oral argument on March 12, 2015, the Court raised
a question as to the effect of Plaintiff's lack of opposition
to Cigarette's motion: whether Blumenstein Defendants'
opposition to Cigarette's motion survived if Plaintiff did
not also oppose it, or if Cigarette was instead entitled to
an automatic grant of summary judgment.

In its responsive briefing, Cigarette argues that
Blumenstein Defendants' cross-claims of contribution and
indemnification are derivative of Plaintiff's underlying
action and the Court should therefore dismiss the cross-

Gendelman v. Blumenstein, Not Reported in F.Supp.3d (2015)

2015 WL 3489883

claims, since Plaintiff does not oppose Cigarette's motion. Where a plaintiff drops his claim against a co-defendant, "it follows that [plaintiff's] disclaimer of all such damages necessarily extinguishes all cross-claims that are derivative of those injuries." *Dougherty v. A O Smith Corp.,* No. CV 13–1972–SLR–SRF, 2014 WL 3542243, at *18 (D.Del. July 16, 2014) (internal quotation marks and citations omitted).

**\*2** However, failing to file opposition to a summary judgment motion is not equivalent to dropping a claim. "Plaintiffs' failure to respond is not alone a sufficient basis for the entry of a summary judgment." *Muskett v. Certegy Check Servs., Inc.,* No. CIV. 08–3975 JBS/JS, 2010 WL 2710555, at *3 (D.N.J. July 6, 2010) (citing *Anchorage Assocs. v. Virgin Islands Bd. of Tax Review,* 922 F.2d 168, 175 (3d Cir.1990)). Fed.R.Civ.P. 56(e) requires that a Court determine "even for an unopposed summary judgment motion, whether the motion for summary judgment has been properly made and supported and whether granting summary judgment is 'appropriate[.]' " *Muskett,* 2010 WL 2710555, at *3. Therefore, the Court must independently evaluate the merits of Cigarette's motion, even without formal opposition from Plaintiff.

As the sole opponents to Cigarette's motion, Blumenstein Defendants now state that the line of inquiry regarding manufacturing or design defects in the boat's steering system was "pursued during discovery but ultimately found to be unavailing." (Blumenstein Opp. Br., Dkt. No. 77 at 7–8, n. 2) The Court therefore dismisses any claims on the basis of manufacturing or design defects, leaving only the claims alleging a failure to warn under theories of negligence and strict liability.[3]

Cigarette moves for summary judgment in its favor upon the claims remaining against it, and for the reasons set forth below, the Court will GRANT Cigarette's motion.

### I. Relevant Facts

This Court's Local Rule 56.1 provides that "any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion." L. Civ. R. 56.1. *See New Jersey Carpenters Pension Fund v. Hous. Auth. & Urban Dev. Agency of the City of Atl. City,* No. CIV.A. 12–2229 JBS/A, 2014 WL 7205331, at *2 (D.N.J. Dec. 17, 2014). Because Plaintiff has not filed a statement

of undisputed material facts, the Court treats facts not disputed between Cigarette and Blumenstein Defendants as undisputed for purposes of Cigarette's motion.

The facts relevant to Blumenstein Defendants' opposition to Cigarette's motion for summary judgment relate to the propellers that Plaintiff and Defendant used on the Vessel. An individual named David Strohminger purchased the Vessel, originally manufactured in 2003 with four-blade Bravo I propellers, and owned it for nearly eight years, apparently without incident. (CSOF ¶¶ 22, 24; CMSJ Hr'g Tr. 11, Apr. 16, 2015, Dkt No. 118) Plaintiff's company Professional Sales, Inc., purchased the Vessel,[4] still equipped with the same four-blade propellers, from Mr. Strohminger on September 6, 2011. (CSOF ¶ 25; CMSJ Hr'g Tr. 3–6). On the morning of the accident, however, Plaintiff borrowed five-blade propellers from an individual named Lou Perrone at A to Z Marina. (Blumenstein Defs.' Statement of Material Facts Not in Dispute ("BSOF") ¶ 42; Pl. Dep., Dkt. No. 78–1 at 123–128) The parties cannot recall which individual replaced the propellers, but they agree that on the day of the accident, either Plaintiff or Blumenstein physically mounted the five-blade propellers on the Vessel in place of the original four-blade ones. (CSOF 28; BSOF ¶ 28) There is no dispute that they changed the propellers in order to increase the speed of the Vessel. (BSOF ¶ 42; CMSJ Hr'g Tr. 7)

**\*3** After changing the propellers, Plaintiff and Defendant Blumenstein took the Vessel out on the water, and Plaintiff drove for approximately 45 minutes without incident. (CMSJ Hr'g Tr. 8) Defendant Blumenstein then took the wheel and the accident occurred in approximately 50 seconds. (*Id.*) Blumenstein Defendants now point to the five-blade propellers as the cause of the accident and allege liability against Cigarette for failing to provide any warnings on the Vessel regarding the usage of such propellers. (BSOF ¶ 46)

### II. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

In deciding a motion for summary judgment, the court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Pitney Bowes, Inc. v. Hewlett–Packard Co.,* 182 F.3d 1298, 1304 (Fed.Cir.1999); *Boyle v. Allegheny Pennsylvania,* 139 F.3d 386, 393 (3d Cir.1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986); *Novartis Corp. v. Ben Venue Labs., Inc.,* 271 F.3d 1043, 1046 (Fed Cir.2001). A fact is material only if it will affect the outcome of a lawsuit under the applicable law, and a dispute of a material fact is genuine if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 249, 252 (1986). The court's role in deciding the merits of a summary judgment motion is to determine whether there is a genuine issue for trial, not to determine the credibility of the evidence or the truth of the matter. *Id.* However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to deny a defendant summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

### III. Jurisdiction

The parties agree that this Court has jurisdiction over this matter, but the basis for that jurisdiction is in dispute at this time. *See* Defs.' Ltr. dated February 12, 2015, Dkt. No. 89. Plaintiff originally claimed diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) on the grounds that Plaintiff is a resident of Pennsylvania, Defendants Blumenstein and PBS are residents of New Jersey, and the amount in controversy exceeds $75,000. (Compl.¶¶ 2–8)

When Defendant Blumenstein represented to the Court that his residence is actually in Pennsylvania thereby defeating diversity, Plaintiff refiled an amended Complaint claiming jurisdiction instead on the basis of admiralty pursuant to 28 U.S.C. § 1333, as the accident occurred on interstate navigable waters. (Pl. Second Mot. for Leave to Amend Compl., Dkt. No. 86 ¶¶ 15–17; Am. Compl., Dkt. No. 21 ¶ 2) Plaintiff has since contended that Defendant Blumenstein is in fact a resident of New Jersey, contrary to his representations to the Court, and now seeks to amend his Complaint once again to claim jurisdiction on the basis of diversity. *See* Pl. Second Mot.

for Leave to Amend Compl., Dkt. No. 86. The Court is in the process of conducting fact-finding on this matter. (*See* Order Scheduling Discovery Regarding Citizenship of Defendant Blumenstein, Dkt. No. 95)

**\*4** Relevant to the instant motion, Blumenstein Defendants have argued that maritime law should govern rather than state products liability law. But "[a]bsent a controlling statute, maritime law is 'developed by the judiciary' and is an 'amalgam of traditional common-law rules, modifications of those rules, and newly created rules.' " *Conner v. Alfa Laval, Inc.,* 842 F.Supp.2d 791, 796 (E.D.Pa.2012) (quoting *E. River Steamship,* 476 U.S. 858, 864–65 (1986). Within the context of a products liability case, a court may therefore "examine the development of products-liability law[ ] under both admiralty and state common law." *Id.*

For purposes of the motion at bar, therefore, the Court finds that there is no relevant conflict between state and maritime law.

### IV. Discussion

Under New Jersey law, a manufacturer shall be liable for failure to warn "if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it ... failed to contain adequate warnings or instructions[.]" N.J.S.A. § 2A:58C(2). A plaintiff must show that defendant had a duty to warn, breached that duty, and that the breach caused plaintiff's damages. *See James v. Bessemer Processing Co.,* 155 N.J. 279, 714 A.2d 898 (1998) (internal citation omitted).

Here, there is a genuine dispute of fact regarding breach. Plaintiff stated that Cigarette represented in an interrogatory response that it had not provided any warnings regarding the propellers. (CMSJ Hr'g Tr. 10) The parties agree, however, that the previous owner likely received an instruction manual with the Vessel, though the parties are unable to establish whether such a manual included a warning not to use five-blade propellers or an instruction on how to mount them if they were used. (*Id.* at 9–10) Cigarette represented that the manual, with or without such a warning, was on the Vessel at the time of the accident, but Plaintiff indicated that the manual "disappeared" after the accident and was not found when

the boat was salvaged. (*Id.* at 9–10, 38–39) The Court recognizes therefore that there is a genuine dispute of fact regarding the content of these manuals, and whether or not they were on board the Vessel when Plaintiff's company purchased it and on the date of the accident.

However, these factual disputes regarding the element of breach are not material, because even viewed in the light most favorable to the non-moving parties, Cigarette has established that no genuine issues of material fact remain regarding the elements of duty and causation.

### a. Duty to Warn

"In a failure-to-warn case, 'the duty to warn is premised on the notion that a product is defective absent an adequate warning for foreseeable users that 'the product can potentially cause injury.' " *Lopez v. Borough of Sayreville,* No. A–0158–06T5, 2008 WL 2663423, at *15 (N.J.Super.Ct.App.Div. July 9, 2008) (*quoting Clark v. Safety–Kleen Corp.,* 179 N.J. 318, 336, 845 A.2d 587 (2004)). "The manufacturer of a product has a duty to warn about any risk relating to the product that it knows or ought to know, *Feldman v. Lederle Labs.,* 97 N.J. 429, 434, 479 A.2d 374 (1984), unless the risk and the way to avoid it are obvious." *Id.* (additional citation omitted).

**\*5** This knowledge requirement applies to both negligence and strict liability cases. A negligence action lies for failure to warn "only when the seller knew of the product['s dangerous propensities and had reason to know that the buyer would not realize the product's menacing propensities." *Delta Marine, Inc. v. Whaley,* 813 F.Supp. 414, 418 (E.D.N.C.1993). A strict liability action typically does not require such knowledge, but Comment j to Section 402A of the Restatement (Second) of Torts (1965) [5] provides that strict liability based on a failure to warn (as opposed to a manufacturing or design defect), "considers sellers liable for failure to give an adequate warning only when the seller knew or should have known of the danger." *Delta Marine,* 813 F.Supp. at 418. "Under this standard negligence and strict liability in warning cases may be deemed to be functional equivalents." [6] *Feldman,* 97 N.J. at 452.

In order to establish a duty to warn in the instant matter, the non-moving parties must show that the evidence presented, viewed in the light most favorable to

themselves, supports their assertions that the use of five-blade propellers was dangerous on a Top Gun boat such as the Vessel; that Cigarette knew or should have known of that danger; and that the use of such five-blade propellers was foreseeable to Cigarette.

First, there is a genuine dispute of material fact as to whether five-blade propellers are in fact dangerous or harmful on a Top Gun boat. Blumenstein Defendants' expert [7] argues that the five-blade propellers create "transom lift" unbalancing the boat and "creating a problem for directional change." (Martin Rep., Dkt. No. 71–1 at 6) Cigarette's representative Bud Lerow appears to support this argument by agreeing that a five-blade propeller would create more transom lift, meaning the back of the boat would rise, and the nose of the boat would be pushed down into the water, where "[t]he water wants to push it around." (Lerow Dep. at 103–106) Plaintiff's expert, however, opines that transom lift "is not directly influenced by a propeller's blade count" at all but rather "is caused by non-axial oblique flow or a difference in the velocity, direction, or state of the water in the distance from the top to the bottom of the propeller." (MacPherson Rep., Dkt. No. 71–3 at 5) The Court therefore assumes for purposes of this motion that a reasonable jury could find that the use of the five-blade propellers was dangerous.

The Court therefore reaches the question of whether Cigarette knew or should have known of such danger. To make this claim regarding Cigarette's knowledge, Blumenstein Defendants rely on the testimony of Cigarette representative Bud Lerow, which referred to the fact that Cigarette tested and rejected five-blade propellers for Top Gun boats such as the Vessel. (Blumenstein Opp. Br. 11–12)

Cigarette representative Bud Lerow testified that Cigarette would not recommend running anything bigger than a four-blade propeller on the Vessel, because a five-blade propeller would create more transom lift, meaning the back of the boat would rise, and the nose of the boat would be pushed down into the water, where "[t]he water wants to push it around." (Lerow Dep. at 103– 106) Mr. Lerow added that Cigarette had tested five-blade propellers on a boat like the Vessel and "didn't like the way [the 38# boats] handled with five blades ." (*Id.* at 106: 3–4) Mr. Lerow also testified that if five-blade propellers were to be put on the Vessel, he would have had them mounted higher than where four-blade propellers are mounted and

Gendelman v. Blumenstein, Not Reported in F.Supp.3d (2015)

2015 WL 3489883

he would have them turn inboard, so that the nose would pick up rather than be pushed down. (*Id.* at 106: 9–11; 109: 14–24)

**\*6** Nonetheless, as the standard makes clear, the non-moving parties must show that Cigarette knew or should have known of the "danger" or the "harmful effects" of the product. The fact that Cigarette "didn't like the way [the 38# boats] handled with five blades" does not establish that Cigarette understood the five-blade propellers to be *dangerous* on boats like the Vessel. As Blumenstein himself stated with regard to the propellers, "I never said there was any danger. The boat may handle differently, yes, but just because you change a set of props don't [sic] mean you're going to get into a boat accident." (Blumenstein Dep. Tr. 201:3–6)

Similarly, Blumenstein Defendants attempt to suggest that Cigarette's testing and rejection of the five-blade propellers imposed on Cigarette a duty to warn against their use. But a manufacturer is not required to warn users against alternatives that they try and reject, unless safety concerns are implicated. The Court will not presume that a preference for a particular propeller and a certain type of handling during testing reflects a suspicion that any rejected alternative is hazardous to users.

Finally, even if the Court were to accept that the five-blade propellers were dangerous on boats such as the Vessel and that Cigarette was aware of that danger, "[t]he plaintiff in a product defect case also has the burden of showing that the product was not misused or, if it was, that the misuse was objectively foreseeable." *London v. Lederle Labs., Div. of Am. Cyanamid Co.,* 290 N.J.Super. 318, 27, 675 A.2d 1133, 1138 (App.Div.1996) *aff'd as modified sub nom. Batson v. Lederle Labs., a Div. of Am. Cyanamid Co.,* 152 N.J. 14, 702 A.2d 471 (1997). The foreseeability of the misuse of a product generally cannot be determined as a matter of law and is left instead to a jury unless "the inferences are so clear that a court can say as a matter of law that a reasonable manufacturer could not have foreseen the change." *Port Auth. of New York & New Jersey v. Arcadian Corp.,* 991 F.Supp. 390, 401 (D.N.J.1997) aff'd, 189 F.3d 305 (3d Cir.1999).

Here, Blumenstein Defendants argue that the non-moving parties' replacement of the four-blade propellers with five-blade ones was foreseeable, because Cigarette tested the 38# Top Gun with five-blade propellers and rejected

them, among other types of propellers. (Defs.' Opp. Br. at 13) Again, such evidence about product testing while choosing a default installment indicates nothing about whether Cigarette expected its customers to change its products once purchased. The non-moving parties offer no evidence that Cigarette's customers routinely experimented with propeller changes or other comparable alterations.

Because no rational jury could find from the evidence that it was foreseeable to Cigarette that its customers would use five-blade propellers, even if the jury could find that the propellers were dangerous and that Cigarette was aware of the danger, the Court finds that Cigarette had no duty to warn Plaintiff and Blumenstein regarding five-blade propellers.

### b. Causation

**\*7** In addition, the non-moving parties have failed to provide evidence from which a rational jury could find causation.

"Causation is a fundamental requisite for establishing any product-liability action." *Coffman v. Keene Corp.,* 133 N.J. 581, 594, 628 A.2d 710, 716 (1993). In failure-to-warn cases, "a plaintiff is required to prove that the absence of a warning was a proximate cause of his harm." *Id.* "Ordinarily, the jury considers issues of proximate cause ... [but] courts may resolve for themselves the question of legal or proximate causation if they conclude that no reasonable jury could find such causation on the record presented." *Shelcusky v. Garjulio,* 172 N.J. 185, 206, 797 A.2d 138, 151–52 (2002).

In New Jersey, courts apply a "heeding presumption" that plaintiff "would have followed an adequate warning had one been provided." *James,* 155 N.J. at 297 (*quoting Coffman,* 133 N.J. at 603). This presumption is rebuttable, however, if a defendant can offer evidence concerning the plaintiff's knowledge of the risk that the absent warning was supposed to address.

If the user of a product knows at the moment of use the very danger of which a warning would have apprised him, but chooses to disregard that conscious knowledge, then the presence or absence of the warning is irrelevant. *Vallillo v. Muskin Corp.,* 212 N.J.Super.

155, 159–60 (N.J.Super.A.D., 1986). There is 'no need to warn one of a danger he already knows.' *McGrath v. American Cyanamid Co.,* 41 N.J. 272, 275 (1963).

*Leja v. Schmidt Mfg., Inc.,* No. CIV. 01–5042DRD, 2008 WL 906252, at *4 (D.N.J. Mar. 31, 2008).

Here, the non-moving parties must first offer evidence from which a rational jury could conclude that the five-blade propellers themselves were a proximate cause of the accident. As discussed during oral argument, the parties did not and cannot reasonably dispute that any flat-bottom boat such as the Vessel would capsize if turned suddenly at a sufficiently high rate of speed, regardless of what propellers were attached. (CMSJ Hr'g Tr. 42–44)[8] Though the speed at the time of the accident is disputed, Blumenstein drove the Vessel for less than one minute prior to the accident, and during that minute, took the Vessel to a disputed high speed and, slowed down a disputed amount, and attempted to make a turn, at which time the Vessel capsized and the accident occurred. (CSOF ¶ 3)

Blumenstein Defendants now claim that the five-bladed propellers proximately caused the accident by unbalancing the boat during the turn. To support this statement, they claim that their expert Tres Martin "explained that the five bladed propellers and their transom lifting effect created an unbalanced boat which resulted in a loss of control during the turn and played a major role in the accident." (BSOF ¶ 47)

This summary overstates Mr. Martin's opinion. Mr. Martin's report states generally, among other things, that "[w]ith a five-bladed propeller this boat can encounter control loss even with an experienced driver operating competently." (Martin Rep. at 4) However, he offers no opinion in his report regarding the cause of this accident in particular. During his deposition, in response to the question, "Do you have an opinion as to what caused the accident?" Mr. Martin stated only possibilities: "A couple contributors. Possibly speed. Possibly the five-blade props. Possibly water conditions as well." (Martin Tr. 140:15–19, Dkt. No. 71-2) When asked if driver error played a role, he stated, "It's possible" due to "[t]rim position" or "too much of a hard turn." (*Id.* at 141, ll. 3–8) He also affirmed that "if ... this boat had four blades, propellers, the accident still could have happened [.]" (*Id.* at 139:6–10) No rational juror could conclude from this

testimony that the propellers "played a major role in the accident" at issue.

**\*8** Nonetheless, in drawing all inferences in favor of non-moving parties, the Court accepts that a rational juror could conclude that the five-blade propellers contributed in some way to the accident. It is yet another leap from there, however, to show that Cigarette's failure to warn about the propellers proximately caused their use on the date of the accident.

Because the non-moving parties are entitled to the heeding presumption, the Court presumes that Plaintiff and Defendant Blumenstein would have followed a warning regarding the propellers, if such warning had been provided. To rebut this presumption, Cigarette provides evidence that the non-moving parties had "knowledge of the risk that the absent warning was supposed to address." Blumenstein, the operator of the Vessel during the accident, not only has over thirty years of experience in boating and considers himself an expert in the handling of boats in general (Blumenstein Dep. Tr. 211: 19–25), he specifically testified that it was his practice to warn customers for whom he was changing propellers that such a change could affect steering (*Id.* at 198: 10–13). On the date of the accident, he took no additional precautions to ensure the safety of the new propellers, because he was planning to operate the boat himself: "I wouldn't warn myself. I would operate the boat and find out." (*Id.* at 198: 14–24) Blumenstein further states that he did not warn Plaintiff, because Plaintiff "was a partner in the boat" who Blumenstein knew "had owned boats previous to this, operated boats" and who Blumenstein "assumed ... was knowledgeable himself." (*Id.* at 218: 2–18)

The Court finds this evidence sufficient to rebut the heeding presumption. Plaintiff and Defendant Blumenstein already knew that changing the propellers would affect the Vessel's handling, and additional warnings about handling would have been redundant. Having lost the benefit of the presumption, Blumenstein does not argue at any point that he would have done anything differently had Cigarette provided a warning regarding the five-blade propellers, such that a warning not to use them may have prevented Plaintiff's damages. Given that there is no dispute that Defendant Blumenstein was already aware of the information that Cigarette's warnings would have provided, the Court finds that

Gendelman v. Blumenstein, Not Reported in F.Supp.3d (2015)

2015 WL 3489883

no reasonable jury could find causation on the record presented.

**V. Conclusion**

Cigarette has demonstrated that no genuine issues of material fact remain, and no rational juror could conclude from the evidence presented that Cigarette had a duty to warn Plaintiff and Blumenstein or that its failure to do so proximately caused Plaintiff's damages. The Court will therefore grant Cigarette's motion for summary judgment and dismiss Blumenstein Defendants' cross-claims. An appropriate Order accompanies this Opinion.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 3489883

Footnotes

1    Blumenstein is an employee and sole member of PBS.

2    Blumenstein Defendants responded to Plaintiff's Interrogatory No. 20 ("Describe, in detail, your version of the accident") on June 24, 2013, as follows: "[Blumenstein] Defendants believe that the rollover was caused by the use of propellors [sic] which were not designed or intended for use on the boat as well as a defect in the steering gear which caused the propellors [sic] to turn at a much higher degree than the operator's input resulting in a sharper turn than intended. As it was Mr. Gendelman who obtained the propellors [sic], at this time, defendants do not know the make or manufacturer of the propellors [sic]." (Defs.' Resp. to Pl.'s Int., Dkt. No. 16–1 at 13–14)

3    The Court includes in its dismissal the non-moving parties' breach of warranty claims, which Blumenstein Defendants do not argue.

4    Plaintiff owns 51 percent of Professional Sales, Inc., and despite sales paperwork indicating that Andrew Biddle purchased the Vessel (Dkt. No. 69–2 at 4), the parties have clarified that Mr. Biddle found the boat on behalf of Plaintiff's company, and it was Plaintiff's company that purchased it (CMSJ Hr'g Tr. 3–5).

5    Section 402A, which governs the doctrine of strict products liability, provides that "[a] manufacturer is liable for harm caused by a product sold in a defective condition unreasonably dangerous," and a product that provides inadequate instructions or warnings at the time of sale or distribution qualifies as defective, *Restatement* (Third) of Torts: Prods. Liab. § 2 (1998). *See also Conner v. Alfa Laval, Inc.*, 842 F.Supp.2d 791, 796–97 (E.D.Pa.2012).

6    The Court notes that under strict liability, "knowledge of the harmful effects of a product will be imputed to a manufacturer on a showing that knowledge of the defect existed within the relevant industry;" in contrast, under a negligence theory, "the plaintiff must demonstrate that the specific defendant knew or should have known of the potential hazards of the product." *James,* 155 N.J. at 298 (internal citation omitted). Here, the non-moving parties have not attempted to argue that five-blade propellers are known in the industry to be harmful on boats such as the Vessel. The Court therefore treats the strict liability and negligence claims against Cigarette as functionally equivalent.

7    Plaintiff has moved to exclude Blumenstein Defendants' expert on the grounds that Mr. Martin "lacks the requisite qualifications and the opinions expressed in his report are mere speculation." (Pl. Mot. to Exclude Blumenstein Defs.' Expert, Dkt. No. 71 at 9) The Court finds that Mr. Martin's extensive experience racing and testing boats such as the Cigarette qualify him an expert on their handling with regard to various propellers. (Blumenstein Defs.' Opp. to Pl.'s Mot. to Exclude Expert, Dkt. No. 76 at 6) The Court also finds that Plaintiff's objections to Mr. Martin's methodology and the definitiveness of his opinions are appropriate issues to raise through cross-examination, rather than exclusion. The Court will therefore DENY Plaintiff's motion.

8    To the extent propellers contributed to the Vessel's speed, no one has argued that the Vessel crashed at a rate of speed that it would not have been able to achieve with standard-issue four-blade propellers.

End of Document                                   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "F"

Plasencia v. Orgill, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 819063

2012 WL 819063
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
D. New Jersey.

Matthew PLASENCIA, et al., Plaintiff,
v.
ORGILL, INC., et al., Defendants.

Civil No. 09–5727 (FLW).
|
March 9, 2012.

**Attorneys and Law Firms**

Michael D. Shaffer, Shaffer & Gaier, LLC, Haddonfield, NJ, for Plaintiff.

Kerri E. Chewning, William J. O'Kane, Archer & Greiner, PC, Haddonfield, NJ, for Defendants.

**OPINION**

WOLFSON, District Judge.

**\*1** This diversity action stems from an aerosol spray paint can ("spray paint can" or "aerosol can") injury that caused debilitating injuries to Plaintiff Matthew Plasencia's ("Mr.Plasencia's") eye and rendered him permanently disabled. Presently before the Court are two motions for summary judgment: one by Defendant Ball Aerosol and Specialty Container, Inc. ("Ball"), the designer and manufacturer of the spray paint can, and another by Defendants Rust–Oleum Corp. ("Rust–Oleum"), the company that filled the can with paint once it was manufactured, as well as Orgill, Inc. and RPM International Inc. Plaintiff Matthew Plasencia along with his co-plaintiff and wife, Heather Plasencia ("Mrs.Plasencia") (collectively, "Plaintiffs"), concede that Orgill, Inc. ("Orgill") and RPM International Inc. ("RPM"), should be dismissed from this action, which leaves Ball and Rust–Oleum as the only two remaining defendants.[1]

The Court held oral argument on both summary judgment motions on March 8, 2012. Most aspects of the parties' motions were decided on the record. The Court issues the instant Opinion solely on the issue of punitive damages. For the reasons explained herein, summary judgment is granted on Plaintiffs' request for punitive damages against both Ball and Rust–Oleum.

**I. BACKGROUND**

**A. Facts**

The following facts are undisputed by the parties unless otherwise indicated. Prior and up until the spray paint can incident, Mr. Plasencia worked as a quality control inspector for Mid–State Filigree Systems ("Mid–State") a concrete slab manufacturer located in Cranbury, New Jersey. Mr. Plasencia's job responsibilities included performing quality control on cured, prefabricated slabs of concrete before those slabs were shipped from the Cranbury plant. At the beginning of his work day, Mr. Plasencia would take a can of blue spray paint and mark any deformities he found on a given concrete slab. The day before Mr. Plasencia performed his quality control review, concrete was poured and set in beds in the late morning and afternoon. Then, the slabs would cure overnight while set on top of a series of large gas-fired butane heaters measuring approximately 480 feet in length.

On February 17, 2009, at 6:20 a.m., Mr. Plasencia opened a new can of blue spray paint to use when marking slabs. According to Mr. Plasencia, the label on the can advised that the can should be shaken for approximately 30 seconds, and further directed users: "do not heat, do not puncture, do not put near flammables ...." Plasencia Dep. 77:8–11. While he was preparing to use the spray paint can, Mr. Plasencia was standing nearby the slab curing bed. It is not clear from the testimony where exactly Mr. Plasencia was standing and how far away he was from the curing bed and butane heater at that time.

Mr. Plasencia shook the can before attempting to utilize it, but did not hear the agitator ball rattle. He shook the can again in order to loosen the agitator ball and it exploded in his face. Mr. Plasencia sustained severe injuries to his face and eye as a result.

**\*2** Following the accident, the aerosol can was preserved. It was discovered that Ball manufactured the body of the can and the bottom of the can, including its seam. Ball then sold the can to Rust–Oleum for filling and capping. Rust–Oleum filled the can with the blue spray paint, added a "dip tube" which brings paint from the bottom

2012 WL 819063

of the can to the spray nozzle, and the nozzle. Plaintiffs, Ball, and Rust–Oleum secured experts who analyzed the can and have espoused competing theories as to why the can exploded. Additional facts relating to the parties' expert reports, the manufacturing and testing processes, and the incident itself are discussed in more detail, where appropriate, below.

### B. Procedural History

Plaintiffs initially filed their Verified Complaint ("Complaint") in the Philadelphia County Court of Common Pleas on May 1, 2009. In their Complaint, Plaintiffs alleges that Mr. Plasencia was injured at work when a spray paint can entitled Premium Indoor/ Outdoor Multi–Purpose Enamel DOT 2P 5702; Serial No. 2006612172, Model No. MP1008 Gloss Royal Blue 1439728 exploded in his face on February 17, 2009. Compl., ¶¶ 7–14. A few weeks after the complaint was filed, on May 19, 2009, Defendant Orgill, Inc. removed the suit to the United States District Court for the Eastern District of Pennsylvania on the basis of diversity jurisdiction. Thereafter, on June 12, 2009, Plaintiffs filed a Verified Amended Complaint ("Amended Complaint").

The Amended Complaint asserts four counts under New Jersey law: Count I is a negligence claim against Orgill, Rust–Oleum, RPM, and Ball Corp.; Count II is a product liability claim governed by the New Jersey Product Liability Act, N.J.S.A. 2A:58C–1 *et seq.* ("NJPLA") against all defendants; Count III is a breach of warranty claim against all defendants; and, lastly, Count IV is a loss of consortium claim by Mrs. Plasencia against all defendants. To be clear, and as noted, Plaintiffs concede that Defendants Orgill and RPM should be dismissed. Plaintiffs also concede, as they should, that the negligence claim and the breach of warranty claim are subsumed by their product liability claim. See *Sinclair v. Merck & Co.,* 195 N.J. 51, 65, 948 A.2d 587 (2008) (holding that "when the underlying claim is one for harm caused by a product" that claim is subsumed by the NJPLA). Hence the remaining two counts in the Amended Complaint are against Ball and Rust–Oleum for product liability (Count II) and loss of consortium (Count IV). Through their product liability claim, Plaintiffs asserts that the spray paint can is both defectively designed and manufactured, and that the label fails to warn of all hazards.

On July 28, 2009, after the Amended Complaint was filed, several of the defendants moved to transfer the suit to the District of New Jersey. That motion was granted on October 9, 2009. The parties engaged in discovery and, on January 28, 2011, Ball moved for summary judgment on Plaintiffs' Amended Complaint. That same date, Orgill, RPM, and Rust–Oleum also moved for summary judgment. During the parties' extensive briefing period, a dispute arose as to the propriety of Plaintiffs' sur-reply brief to Ball's motion. Plaintiff attached to that brief a Supplemental Expert Report by their expert, Dr. David Pope. Ball objected to the attachment of the supplemental report and requested that the sur-reply be stricken. Judge Lois H. Goodman, the Magistrate Judge assigned to this matter, addressed this issue with the parties, and Defendants agreed to withdraw their summary judgment motions in order to engage in additional discovery on the supplemental expert report. The defendants withdrew their motions on June 13, 2011, without prejudice, and with the right to re-file no later than August 26, 2011.

**\*3** On that date, August 26, 2011, Ball and Rust–Oleum re-filed their respective motions. The parties, again, engaged in extensive briefing, including the filing of a sur-reply brief and numerous exhibits.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where the Court has determined that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P.* 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A "material fact" is one that could affect the outcome of a suit under the applicable rule of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Disagreements over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id.* "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses, and ... that [the rule] should be interpreted in a way that allows it to accomplish this purpose." *Celotex,* 477 U.S. at 323–24. "[W]hen the record is such that it would not support a rational finding that an essential element of the non-moving party's claim or defense exists, summary judgment must be entered for the moving party." *Turner v. Schering–Plough Corp.,* 901 F.2d 335, 341 (3d Cir.1990).

The party moving for summary judgment has the burden of establishing that no "genuine issue" exists. *Celotex,* 477 U.S. at 330. Once the moving party satisfies this initial

2012 WL 819063

burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P. 56(e).* To do so, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324. In other words, the non-moving party must "do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Ridgewood Bd. of Ed. v. Stokley,* 172 F.3d 238, 252 (3d Cir.1999).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249. A genuine issue of material fact is one that will permit a reasonable jury to return a verdict for the non-moving party. *Id.* at 248. In evaluating the evidence, a court must "view the inferences to be drawn from the underlying facts in the light most favorable to the [non-moving] party." *Curley v. Klem,* 298 F.3d 271, 276–77 (3d Cir.2002) (citations omitted).

### III. DISCUSSION

Under New Jersey's Punitive Damage Act ("the Act"), punitive damages may be awarded "only if the plaintiff proves, by clear and convincing evidence, that ... the defendant's acts or omissions ... were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions." N.J.S.A. 2A:15–5.12. "Actual malice means an intentional wrongdoing in the sense of an evil-minded act." N.J.S.A. 2A:15–5.10 (internal quotation mark omitted). "Wanton and willful disregard is defined as a deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences of such act or omission." *Id.*

\*4 Negligent, even grossly negligent, conduct cannot form the basis of a punitive damages claim. *Smith v. Whitaker,* 160 N.J. 221, 242, 734 A.2d 243 (1999). "There must be circumstances of aggravation or outrage, which may consist of such a conscious and deliberate disregard of the interests of others that the [defendant's] conduct may be called wanton and willful." *Dong v. Alape,* 361 N.J.Super. 106, 116, 824 A.2d 251 (App.Div.2003). This

"standard can be established if the defendant knew or had reason to know of circumstances which would bring home to the ordinary reasonable person the highly dangerous character of his or her conduct." *Id.* at 116–17, 824 A.2d 251 (citing *McLaughlin v. Rova Farms, Inc.,* 56 N.J. 288, 306, 266 A.2d 284 (1970)).

The Punitive Damages Act further instructs that:

In determining whether punitive damages are to be awarded, the trier of fact shall consider all relevant evidence, including but not limited to, the following:

(1) The likelihood, at the relevant time, that serious harm would arise from the defendant's conduct;

(2) The defendant's awareness of reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct;

(3) The conduct of the defendant upon learning that its initial conduct would likely cause harm; and

(4) The duration of the conduct or any concealment of it by the defendant.

N.J.S.A. 2A:15–5.12b. These factors are non-exclusive. *See Pavlova v. Mint Management Corp.,* 375 N.J.Super. 397, 404, 868 A.2d 322 (App.Div.2005).

Overall, courts have described the punitive damages standard as a strict one; punitive damages are limited to only "exceptional cases ." *Id. See also Dong,* 361 N.J.Super. at 116, 824 A.2d 251 (noting that defendant's conduct must be "particularly egregious"). Moreover, because punitive damage awards are not designed to compensate plaintiffs, an award does not depend upon the extent of injury suffered. *See Smith,* 160 N.J. at 225, 734 A.2d 243.

Here, Plaintiffs have not alleged that either defendant acted with actual malice. Rather, they assert that both Defendant Ball and Rust–Oleum wantonly and willfully disregarded the interests of users of their spray paint cans by placing defective cans into commerce. Plaintiffs hinge their argument on an internal Rust–Oleum expert report ("the Grunes Report") that addressed spontaneously exploding cans. That report was prepared at the request of Rust–Oleum, who hired an independent expert to analyze incidents involving aerosol cans purchased from Ball's predecessor, U.S. Can, and other manufacturers.

In rendering the report, the expert was given data on six aerosol can explosions, three of which were manufactured by U.S. Can. Pl. Opp., Exh. R ("Grunes Report") at 3. For those explosions, the expert was also provided with the remnants of the cans, which I will refer to hereafter as the "sample cans." Written descriptions of three additional explosions were provided to the expert but, for these, no specimens were provided. *Id.* at 4, 734 A.2d 243.

**\*5** As an initial matter, the Court notes that the report explicitly concludes that its findings are "qualified, requiring additional information" because the sample size of the study was small, some cans were from different manufacturers (other than U.S. Can), and the independent expert had been provided with limited specifications, drawings, and quality control procedures relating to the sample cans. Pl. Opp., Exh. R. With that qualification, the report concludes that the sample cans "all failed by explosive decompression beginning with the neck just above the base seal and propagating about the circumference of the can wall ...." *Id.* at 2, 734 A.2d 243. According to the report,

> [t]he determination as to the cause, made difficult by the infrequency of occurrence, is considered to have stemmed from the can neck design, to include the geometry, the material, as-fabricated, and/or possible can manufacturing defects, including deviations in quality assurance/control.

*Id.*

Moreover, the report continues,

> [t]he design/manufacture of the lower neck created a condition where the stresses attributed to consumer efforts to release the sediment bound agitator (marble) by shaking the can or hitting the bottom were sufficient to flex and crack the notch of the neck allowing the internal pressure to rupture the can wall and spread the rupture around the can circumference.

*Id.* Further, the report indicates that the necks of the sample could not be examined because they were purchased by Rust–Oleum from various manufacturers with adhesive labels covering the necks. *Id.*

The Grunes Report suggests that the can manufacturers, including Ball's predecessor, U.S. Can, "should review the design/manufacture and quality assurance/quality control of the necked-in cans to better understand the stresses on the as-manufactured cans and the neck walls." *Id.* Importantly, the report also distinguishes between cans containing primer and metallic finishes, which are "heavier/denser" than other varieties of paint. *Id.* at 5, 734 A.2d 243. The report suggests that can manufacturers evaluate whether "those [paints] having heavy/dense sediments (e.g., red primer, galvanizing–93% zinc-and 'gold rush')" place greater stress on a can than less dense paints.[2] While recommending a review of the design and manufacture of the necked-in wall feature, the report acknowledges that explosions are nonetheless rare. *Id.* at 11, 734 A.2d 243.

As for Rust–Oleum, the report suggests that Rust–Oleum "audit its handling of ordered cans to better understand the represented features and caveats by the manufacturer to establish if any handling or production activities could have affected the received cans in any way, whether or not associated with the subject problem." *Id.* at 3, 734 A.2d 243. Moreover, the report notes, Rust–Oleum's quality control testing would likely not reveal any defects in the cans necks due to the pre-affixed labels. In addition, a Department of Transportation "hot water bath" quality control test procedure followed by Rust–Oleum would not likely reveal any defect in the cans' necks. *Id.* at 11, 734 A.2d 243.

**\*6** In my view, the Grunes Report does not provide sufficient facts from which a jury could conclude that either Ball or Rust–Oleum knew that their spray paint cans were defectively designed or manufactured, or that either defendant acted willfully and wantonly in continuing to sell the cans. As noted, the defendant's awareness that its reckless disregard of the likelihood that the serious harm at issue would arise from the its conduct is one of the factors courts are to consider in deciding the propriety of a punitive damages request. *See* N.J.S.A. 2A:15–5.12b(2). The Grunes Report expressly qualifies its conclusion that the cans were defectively designed or

manufactured as based on an insufficient sample size, and the report repeatedly refers to the rarity of explosions. In addition, the report focuses on primer and metallic paints products as being especially susceptible to any defects in the cans; Plaintiffs have not argued that the spray paint in the can shook by Mr. Plasencia was of this sort.

Furthermore, to the extent the report makes a conclusion, it suggests that there may be a defect in the can neck design. Here, in contrast, and as Plaintiff's counsel stated at oral argument, Plaintiffs' expert opines that the bottom of the can is defective—not the neck. In short, it is clear from my reading of the Grunes Report that it could not have placed Ball or Rust–Oleum on notice that the type of explosion that occurred here was likely to take place.

My reasoning is in line with that of the New Jersey Appellate Division in *Pavlova, supra.* At issue in that case was a product liability claim against the manufacturer and installer of a wall heater installed in a tenant's bathroom nearby a towel rack. While the tenant was preparing to bathe, her towel hanging on the towel rack caught fire. She sought punitive damages against her landlord (who had installed the heater), alleging that the landlord failed to warn her of the fire-related dangers inherent in placing a towel on a towel rack nearby a wall heater. As evidence of the landlord's willful and wanton conduct, the tenant pointed to two prior fires in her building (of which the landlord was aware) that involved the same wall heaters. *Id.* at 408, 868 A.2d 322. However, because neither of those fires originated in the same manner as her fire, the court did not find those prior incidents probative of the landlord's knowledge. So too, here, the lack of congruence between the explosions examined in the Grunes Report and Mr. Plasencia's explosion shows that the report does not demonstrate willful or wanton conduct on Ball or Rust–Oleum's part.

The *Pavlova* Court also addressed the tenant's reliance on a fire official recommendation that the towel racks not be placed so close to the wall heater. The court held that tenant's reliance was misplaced because the recommendation was not in the form of an order or fire code violation. *Pavlova,* 375 N.J.Super. at 406, 868 A.2d 322. Similarly, here, while the Grunes Report makes several suggestions about further examination that could be done by the defendants, Plaintiff has not pointed to any evidence that these suggestions were echoed by a regulatory agency or standard. They are simply the suggestions of an independent expert and, accordingly, insufficient to support a punitive damages claim in this case. Indeed, "absent here is the blatantly egregious, deliberate conduct that was practically certain to cause both imminent and serious harm." *Pavlova,* 375 N.J.Super. at 407, 868 A.2d 322. At most, Plaintiffs may have alleged negligence by the Defendants, but not wanton and willful disregard of the likelihood of resulting serious harm. Plaintiffs' punitive damages claims against both defendants necessarily fail.

## III. CONCLUSION

**\*7** For the foregoing reasons, summary judgment is granted on Plaintiffs' punitive damages against Defendants Ball and Rust–Oleum. The remaining aspects of the parties' motions were addressed on the record at oral argument and those dispositions will be set forth in an Order accompanying this Opinion.

## All Citations

Not Reported in F.Supp.2d, 2012 WL 819063

Footnotes

1    Based on this concession, Defendants Orgill, Inc. and RPM International Inc. are hereby dismissed from this action.

2    The report suggests that primer and metallic particle coatings tend to form a "heavy" deposit on the bottom of the can and that, consequently, such paints are more difficult to mix with the marble agitator than other paints. *Id.* at 9, 868 A.2d 322.

    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "G"

2013 WL 6508406

2013 WL 6508406
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of New Jersey,
Appellate Division.

Jean M. SMITH and Marie C.
Smith, Plaintiffs–Appellants,
v.
HARRAH'S CASINO RESORT OF
ATLANTIC CITY, Defendant–Respondent.

Argued Oct. 21, 2013.
|
Decided Dec. 13, 2013.

**Synopsis**
**Background:** Taxi driver, who pulled into the valet line
at casino to pick up a fare and who was subsequently
assaulted by casino's security officers, brought action
against casino The Superior Court, Law Division,
Atlantic County, entered summary judgment for casino,
and driver appealed.

**Holdings:** The Superior Court, Appellate Division, held
that:

[1] driver did not establish claim against casino for
negligent supervision, and

[2] driver did not establish claim for false imprisonment.

Affirmed in part, reversed in part, and remanded.

West Headnotes (6)

[1]     **Pretrial Procedure**
        👈 Sequence and Timing; Condition of
        Cause
        **Pretrial Procedure**
        👈 Mental Examination

Taxi driver, who pulled into the valet line
at casino to pick up a fare and who was
subsequently assaulted by casino's security
officers, was not entitled to extension of
discovery to obtain a psychological evaluation
of security officer; casino was not responsible
for driver's failure to obtain a psychologist's
report before the end of the discovery
period, casino had discharged officer from
his position as a result of the incident and
he was no longer within casino's power to
produce for deposition, and driver failed to
take advantage of the extensions that were
granted to complete the discovery he needed.

Cases that cite this headnote

[2]     **Labor and Employment**
        👈 Negligent Training and Supervision

Taxi driver who pulled into the valet line at
casino to pick up a fare and was subsequently
assaulted by casino's security officers did not
establish claim against casino for negligent
supervision; there was nothing in record
suggesting that casino knew or should have
known of dangerous attributes of security
officer or any other employee, record did not
suggest that casino failed to supervise officer
or the other security officers and that, through
its negligent supervision, driver was assaulted
and injured.

6 Cases that cite this headnote

[3]     **Labor and Employment**
        👈 Negligent Training and Supervision

Taxi driver who pulled into the valet line at
casino to pick up a fare and was subsequently
assaulted by casino's security officers did not
establish claim against casino for negligent
training; casino trained new hires by requiring
them to shadow an experienced security
officer for a minimum of five days, and as part
of the training, casino instructed its security
officers to use force only if there was reason to
believe such force was immediately necessary,
and to use the minimum force required.

Cases that cite this headnote

**[4]    Damages**
      ⮞ Particular Cases

Taxi driver, who pulled into the valet line at casino to pick up a fare and was subsequently assaulted by casino's security officers, did not establish claim for negligent infliction of emotional distress, absent evidence showing that he suffered severe emotional distress.

1 Cases that cite this headnote

**[5]    False Imprisonment**
      ⮞ Liability of Officer or Other Person Making Arrest and Persons Assisting Officer

Casino had sufficient legal justification for holding taxi driver, who pulled into the valet line at casino to pick up a fare and who then engaged in altercation with casino's security, and thus, driver did not establish claim for false imprisonment; casino's security personnel detained driver for a short time after he refused to leave the premises and became involved in an altercation with security officers.

Cases that cite this headnote

**[6]    Judgment**
      ⮞ Employees, Cases Involving

Material issue of fact as to whether the force security guard used on taxi driver, who had pulled into the valet line at casino to pick up a fare, was unexpected precluded grant of summary judgment to casino on driver's vicarious liability claim for assault and battery.

Cases that cite this headnote

On appeal from Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L–0827–11.

**Attorneys and Law Firms**

Jude Nelson argued the cause for appellants (The Law Firm of Osei & Nelson, L.L.C., attorneys; Mr. Nelson, on the brief).

Christopher C. Mauro argued the cause for respondent (Camacho Mauro Mulholland, L.L.P., attorneys; Mr. Mauro, on the brief).

Before Judges YANNOTTI, ASHRAFI and LEONE.

**Opinion**

PER CURIAM.

**\*1** Plaintiffs Jean Smith and his wife, Marie Smith, appeal from summary judgment dismissing their complaint against defendant Harrah's Casino Resort of Atlantic City. They allege that Harrah's is liable to them for injuries caused to Jean Smith when Harrah's security officers allegedly assaulted him. We reverse the summary judgment in part and remand for trial on the potential vicarious liability of Harrah's for the alleged intentional tort of assault by the security officers.

Our standard of review from a summary judgment is plenary. Because we review the same documentary record as the trial court, we determine without deference to the trial court's ruling whether disputed issues of fact exist for determination by a jury and, if not, whether the trial court correctly applied the applicable law. *W.J.A. v. D.A.,* 210 *N.J.* 229, 237–38 (2012); *Henry v. N.J. Dept. of Human Servs.,* 204 *N.J.* 320, 330 (2010). We must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 A.2d 146 (1995).

Plaintiffs' amended complaint contains two counts, one seeking compensation for Jean Smith's injuries and the second for Marie Smith's derivative per quod claim. *See Hauck v. Danclar,* 262 *N.J.Super.* 225, 227, 620 A.2d 479 (Law Div.1993) (nature of per quod claim for loss of consortium). Plaintiffs sought recovery from Harrah's under various theories: negligent supervision and training of the casino's security personnel, vicarious liability for the use of excessive force, negligent infliction of emotional

Smith v. Harrah's Casino Resort of Atlantic City, Not Reported in A.3d (2013)
2013 WL 6508406

distress, and false imprisonment. Viewed most favorably to plaintiffs, *see* R. 4:46–2(c); *Brill, supra,* 142 *N.J.* at 540, 666 A.2d 146, the evidence presented in the summary judgment record revealed the following facts.

Jean Smith was a taxi driver in Atlantic City. On January 10, 2011, he pulled into the valet line at Harrah's to pick up a fare. The valet supervisor believed that Smith had cut into the line and directed him to leave. Smith argued that he had been in line and refused to leave. Harrah's security officers arrived on the scene, and an altercation ensued. Security officer Taron Lewis allegedly shoved Smith to the ground. Lewis and other officers subdued Smith, handcuffed him, and briefly placed him in a holding cell before ejecting him from Harrah's premises. A surveillance recording of the incident was preserved and shows the altercation. Smith alleged he was physically and emotionally injured as a result of an assault and battery.

[1]   Discovery in the litigation was initially scheduled to end on May 14, 2012. The court had already granted one extension of the discovery end date at the time that Harrah's moved to reopen discovery on August 16, 2012, so it could submit the report of its medical expert. On September 14, 2012, the court granted Harrah's motion over plaintiffs' opposition to the extension of discovery, and it set September 30, 2012, as the new discovery end date. On September 27, 2012, after Harrah's moved for summary judgment, plaintiffs moved to extend discovery once more so they could submit a psychological evaluation of Jean Smith. The court heard oral argument and denied plaintiffs' motion to extend discovery once again. It granted defendant's motion for summary judgment. It found that plaintiffs did not have sufficient evidence to prove Harrah's negligence, and that Harrah's could not be held vicariously liable for Lewis's conduct because an assault was not within the scope of his employment as a security officer.

*2   Generally, summary judgment is inappropriate when discovery is incomplete if "critical facts are peculiarly within the moving party's knowledge." *Velantzas v. Colgate–Palmolive Co.,* 109 *N.J.* 189, 193, 536 A.2d 237 (1988) (quoting *Martin v. Educ. Testing Serv., Inc.,* 179 *N.J.Super.* 317, 326, 431 A.2d 868 (Ch.Div.1981)) (internal quotation marks omitted). However, summary judgment may be granted if further discovery will not alter the result. *Minoia v. Kushner,* 365 *N.J.Super.* 304, 307, 839 A.2d 90 (App.Div.), *certif. denied,* 180 *N.J.* 354 (2004).

Also, if the discovery period has already closed and the standard for re-opening discovery is not shown, summary judgment may be granted even if the opposing party claims that additional discovery will provide evidence to demonstrate a disputed issue of fact. *Schettino v. Roizman Dev.,* 310 *N.J.Super.* 159, 165, 708 A.2d 446 (App.Div.1998), *aff'd,* 158 *N.J.* 476, 730 A.2d 797 (1999).

Plaintiffs argue that they were not given an opportunity to produce a psychologist's report, that Harrah's did not cooperate in producing Lewis for a deposition, and that Harrah's did not provide documents that plaintiffs had demanded in discovery. Harrah's, however, was not responsible for plaintiffs' failure to obtain a psychologist's report before the end of the discovery period. Furthermore, Harrah's had discharged Lewis from his position as a result of the incident, and he was no longer within Harrah's power to produce for deposition. In addition, plaintiffs received the allegedly delinquent discovery documents along with defendant's summary judgment motion. They have not shown how defendant's failure to produce the documents earlier prejudiced their ability to oppose summary judgment.

Significantly in the circumstances of this case, plaintiffs will not be heard to argue discovery was incomplete because they opposed the second extension of the discovery period and also failed to take advantage of the extensions that were granted to complete the discovery they needed. We find no abuse of discretion in the trial court's denial of plaintiff's motion to re-open discovery. *See Rivers v. LSC P'ship,* 378 *N.J.Super.* 68, 80, 82–83, 874 A.2d 597 (App.Div.), *certif. denied,* 185 *N.J.* 296, 884 A.2d 1266 (2005).

With respect to summary judgment, we agree with the trial court that plaintiffs failed to demonstrate a genuine issue of fact that would support their affirmative claims for negligent supervision and negligent training of the security officers.

A common law claim of negligence has four constituent elements: (1) a duty of care owed to plaintiff by defendant, (2) a breach of that duty by defendant, (3) proximate cause, and (4) actual damages. *Brunson v. Affinity Fed. Cred. Union,* 199 *N.J.* 381, 400, 972 A.2d 1112 (2009). The plaintiff bears the burden of proving each of these elements. *Ibid.*

Where an employer is charged with negligence in the hiring of an employee who caused injury, the plaintiff must prove: (1) the employer "knew or had reason to know of the particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons," and (2) the employer's negligence in hiring the employee resulted in the dangerous attribute proximately causing plaintiff's injury. *Di Cosala v. Kay,* 91 *N.J.* 159, 173–74, 450 *A.2d* 508 (1982). These elements "follow[ ] from tort principles of negligence and foreseeability as well as from firmly established principles of agency and vicarious liability." *Id.* at 170, 450 *A.2d* 508. They are encapsulated in *Restatement (Second) of Agency* § 213 (1958), and *Restatement (Third) of Agency* § 7.05(1) (2006), which states:

> *3 A principal who conducts an activity through an agent is subject to liability for harm to a third party caused by the agent's conduct if the harm was caused by the principal's negligence in selecting, training, retaining, supervising, or otherwise controlling the agent.

Comment d to § 213 of the *Restatement (Second) of Agency* states that an employer may be liable for negligent hiring or negligent supervision if the employer knows or has reason to know that an employee, "because of his qualities, is likely to harm others in view of the work or instrumentalities entrusted to him." An employee's dangerous characteristic may arise from his inexperience, incompetence, or "vicious disposition," but the mere existence of a dangerous quality does not create liability. *Ibid.*

Several jurisdictions have held that a claim of negligent supervision requires proof of the same elements recited by our Supreme Court in *Di Cosala* with respect to a claim of negligent hiring. *See Keller v. Koca,* 111 *P.3d* 445, 446 (Colo.2005); *Giles v. Shell Oil Corp.,* 487 *A.2d* 610, 613 (D.C.1985); *M.V. v. Gulf Ridge Council Boy Scouts, Inc.,* 529 So.2d 1248, 1248 (Fla.Dist.Ct.App.1988); *Alexander v. A. Atlanta Autosave, Inc. .,* 272 Ga.App. 73, 611 *S.E.2d* 754, 758–59 (Ga.Ct.App.2005); *Gray v. Schenectady City Sch. Dist.,* 86 A.D.3d 771, 927 *N.Y.S.2d* 442, 445 (N.Y.App.Div.2011).

Accordingly, we conclude that plaintiffs' claim of negligent supervision required evidence to prove the following elements: (1) Harrah's knew or had reason to know of the particular unfitness, incompetence, or dangerous attributes of Lewis or other security officers who were involved in the incident, (2) Harrah's could reasonably have foreseen that such qualities created a risk of harm to other persons, and (3) through Harrah's negligence in supervising Lewis and the other officers, their dangerous attributes proximately caused plaintiffs' injuries.

[2]   The summary judgment record is devoid of any evidence suggesting that Harrah's knew or should have known of dangerous attributes of Lewis or any other security officer. The record also does not contain any evidence suggesting Harrah's failed to supervise Lewis or the other security officers, and that through its negligent supervision, Jean Smith was assaulted and injured.

[3]   With respect to plaintiffs' claim of negligent training of security officers, the summary judgment record shows that Harrah's provided each newly-hired officer with both a company manual and a security-specific manual detailing the officer's duties. Harrah's trained new hires by requiring them to shadow an experienced security officer for a minimum of five days. As part of the training, Harrah's instructed its security officers to use force only "if there is reason to believe such force is immediately necessary," and to use the minimum force required. Periodically, Harrah's demonstrated the proper use of force at mandatory "control and restraint" classes. While we do not determine one way or the other whether the training of Harrah's security personnel was adequate as a matter of law, plaintiffs have not refuted the evidence of training that defendant produced in support of its motion for summary judgment.

*4 Plaintiffs point to a statement by one security officer that he did not know how Harrah's currently conducted its training and a statement by another security officer that he understood why a supervising security officer said the officers involved in the incident needed a refresher course on control and restraint of unruly persons.[1] Both security officers also stated that they received the training described here. Plaintiffs' evidence is not sufficient to establish a genuine issue of disputed fact that Harrah's was negligent in providing training to its security officers. We

conclude the trial court did not err in dismissing plaintiffs' claim of negligent training as a separate cause of action.

We next address plaintiffs' claims of negligent infliction of emotional distress, false imprisonment, vicarious liability for the intentional tort of assault and battery, and loss of consortium.[2]

**[4]** Negligent infliction of emotional distress requires proof of the traditional elements of negligence, and also evidence that it was "reasonably foreseeable that the tortious conduct [would] cause genuine and substantial emotional distress or mental harm to average persons." *Decker v. Princeton Packet, Inc.,* 116 *N.J.* 418, 429–30, 561 A.2d 1122 (1989). "[T]he emotional distress suffered by plaintiff must be so severe that no reasonable [person] could be expected to endure it." *Ingraham v. Ortho–McNeil Pharm.,* 422 *N.J.Super.* 12, 20 (App.Div.2011) (quoting *Buckley v. Trenton Saving Fund Society,* 111 *N.J.* 355, 366–67, 544 A.2d 857 (1988)), *certif. denied,* 209 *N.J.* 100 (2012). Here, plaintiffs did not present any evidence showing Jean Smith suffered severe emotional distress. The trial court did not err in dismissing the claim of negligent infliction of emotional distress.

**[5]** The claim of false imprisonment requires proof that defendant constrained the plaintiff against his will without legal justification. *Leang v. Jersey City Bd. of Educ.,* 198 *N.J.* 557, 591, 969 A.2d 1097 (2009). Harrah's security personnel detained Jean Smith for a short time after he refused to leave the premises and became involved in an altercation with security officers. Harrah's had sufficient legal justification for holding Smith. Therefore, we affirm the trial court's dismissal of the false imprisonment claim by summary judgment.

Employers are vicariously liable for torts committed by their employees within the scope of employment. *Davis v. Devereux Found.,* 209 *N.J.* 269, 288 (2012) (citing *Restatement (Second) of Agency* § 219[3]). An employee's tortious conduct is considered within the scope of employment when:

(a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master; and (d) if force is

intentionally used by the servant against another, the use of force is not unexpectable by the master.

[*Id.* at 303 (quoting *Restatement (Second) of Agency* § 228(1)).]

**\*5** Intentional torts, including assault and battery, are typically not within the scope of employment unless "the employee's conduct—however aggressive and misguided—originated in his or her effort to fulfill an assigned task...." *Ibid.*

**[6]** Here, Lewis allegedly assaulted Smith in an attempt to remove him from the premises, the kind of task he was employed to perform. Lewis did this during his shift while on Harrah's grounds. Lewis did not have any other reason for his actions than to fulfill his responsibility as a security officer. Furthermore, there is a genuine issue of disputed fact as to whether the force Lewis used was "unexpectable."

Harrah's trained its security personnel not to use excessive force, but that fact does not preclude its vicarious liability. *See id.* at 304–05. A security officer's shoving or otherwise assaulting a person who did not comply with the officer's command was not so far outside the scope of the officer's duties and responsibilities that it would necessarily be deemed unexpectable by the employer and outside the scope of the officer's employment as a matter of law.

Because we conclude that the summary judgment record did not eliminate an issue of fact as to the expectability of the force used by Lewis, we reverse the trial court's determination as a matter of law that Lewis acted outside the scope of his employment. Our conclusions do not preclude Harrah's from presenting evidence at trial of the training and supervision it conducted as part of its factual defense that Lewis's conduct was not expectable and therefore outside the scope of his employment.

Finally, the loss of consortium claim of Marie Smith seeks damages for her "loss of a spouse's services, society, companionship and comfort." *See Hauck, supra,* 262 *N.J.Super.* at 227, 620 A.2d 479. It must also be restored to the extent injuries to Jean Smith were caused by the alleged assault and battery.

Affirmed in part, reversed and remanded in part for trial on plaintiffs' claim of Harrah's vicarious liability for assault and battery. We do not retain jurisdiction.

Smith v. Harrah's Casino Resort of Atlantic City, Not Reported in A.3d (2013)

2013 WL 6508406

**All Citations**

Not Reported in A.3d, 2013 WL 6508406

Footnotes

1      Plaintiffs also rely on a statement of defense counsel, but defense counsel is not a witness and his statements have
       no evidentiary value.

2      Plaintiffs are reminded that we generally deem to be waived any arguments that were not briefed on the appeal. *See
       Gormley v. Wood–El,* 422 *N.J.Super.* 426, 437 n. 3 (App.Div.2011). We address all of plaintiffs' theories, although not
       all were explicitly discussed in plaintiffs' brief, because we deem plaintiffs' arguments to include the claim of respondeat
       superior liability for Lewis's conduct. Defendant Harrah's does not dispute that all of plaintiffs' claims are before us on
       appeal.

3      *Restatement* § 219 provides:

          (1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.

          (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:

             (a) the master intended the conduct or the consequences, or

             (b) the master was negligent or reckless, or

             (c) the conduct violated a non-delegable duty of the master, or

             (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority,
             or he was aided in accomplishing the tort by the existence of the agency relation.

End of Document                              © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "H"

2007 WL 2159615
Only the Westlaw citation is currently available.
(Not for publication)
United States District Court, D. New Jersey.

Kathleen HATALA and Dave Hatala, Plaintiffs,

v.

MOREY'S PIER, INC., et al., Defendants.

Civil No. 04-4679 (RBK).
|
July 25, 2007.

**Attorneys and Law Firms**

Anthony L. Marchetti, Cureton Caplan PC, Mt. Laurel, NJ, for Plaintiffs.

Michelle L. Corea, Capehart and Scatchard, P.A., Mt. Laurel, NJ, Timothy E. Annin, Kelley, Wardell, Craig, Annin & Baxter, LLP, Haddonfield, NJ, for Defendants.

**OPINION**

KUGLER, United States District Judge.

*\*1* Presently before the Court is a motion for partial summary judgment by defendants Morey's Pier, Inc., Morey's Pier Landing Corporation, Morey's Piers Concessions, LLC, and the Morey Organization, Inc. (collectively "Defendants"), seeking to dismiss the claim of plaintiff Kathleen Hatala ("Plaintiff") for punitive damages. For the reasons set forth below, this Court will grant Defendants' motion.

**I. BACKGROUND**

Plaintiff commenced this action by filing a Complaint on August 28, 2003 in the United States District Court for the Eastern District of Pennsylvania. Pursuant to an Order signed by Judge Louis Pollak on July 28, 2004, the action was transferred to this Court. In the Complaint, Plaintiff alleges that on September 3, 2001, Plaintiff and her child rode an amusement known as the "Giant Slide" at Defendants' amusement park. Plaintiff claims that she "slammed into the retaining wall at the bottom of the slide, resulting in serious injury, including, but not limited to, a displaced fracture of her left ankle and extensive bruising." (Compl.¶ 28.) Plaintiff further

claims that as a result of one of Defendants' employees attempting to provide assistance to Plaintiff, Plaintiff was caused to "suffer additional pain, suffering, shock and damage." (Compl.¶ 29.) In the Complaint, Plaintiff seeks compensatory and punitive damages. Plaintiff alleges that "Defendants' actions were willful, wanton, done with a reckless disregard of the high probability of serious injury to others, including Plaintiffs, especially given Defendants' knowledge of prior injuries and similar incidents of patrons' slamming into the retaining wall and suffering injury on the Great Slide." (Compl.¶ 68.) Plaintiff further asserts that "Defendants' actions were extreme and outrageous, therefore permitting the imposition of punitive damages against them, to punish Defendants and deter them from such conduct in the future." (Compl.¶ 69.)

**II. STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 330 (1986). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). When the Court weighs the evidence presented by the parties, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. *Celotex,* 477 U.S. at 330. The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. *Id.* at 331.

*\*2* Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every]

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

## III. DISCUSSION

### A. *Punitive Damages under New Jersey Law*

Punitive damages are available under New Jersey law pursuant to the Punitive Damages Act (the "Act"), N.J.S.A. 2A:15-5.9 to -5.17, which states, in pertinent part:

a. Punitive damages may be awarded to the plaintiff only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. This burden of proof may not be satisfied by proof of any degree of negligence including gross negligence.

b. In determining whether punitive damages are to be awarded, the trier of fact shall consider all relevant evidence, including but not limited to, the following:

(1) The likelihood, at the relevant time, that serious harm would arise from the defendant's conduct;

(2) The defendant's awareness of reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct;

(3) The conduct of the defendant upon learning that its initial conduct would likely cause harm; and

(4) The duration of the conduct or any concealment of it by the defendant.

N.J.S.A. 2A:15-5.12. The Act defines "actual malice" as "an intentional wrongdoing in the sense of an evil-minded act" and "wanton and willful disregard" as "a deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences of such act or omission." N.J.S.A. 2A:15-5.10. Enacted in 1995, the Act is said to "essentially codif[y] ... common law principles." *Dong v.. Alape,* 824 A.2d 251, 257 (N.J.Super.Ct.App.Div.2003) (citing *Smith v. Whitaker,* 734 A.2d 243 (N.J.1999)).

### B. *Analysis*

Plaintiff argues that a jury could reasonably conclude that Defendants' behavior constituted a willful and wanton disregard for Plaintiff's well-being. Plaintiff cites to evidence that during 2000 and 2001, nine people were injured when they struck the retaining pad wall of the Giant Slide. Despite these occurrences, Plaintiff claims that Defendants continued to operate the slide without effecting any changes.

**\*3** Defendants claim that Plaintiff has not submitted sufficient evidence to meet the standard necessary for punitive damages. Defendants claim that "[a]t most, the conduct of Defendants' employees could be deemed negligent." (Defs.' Br. at 9.) Defendants argue that the State of New Jersey had inspected the Giant Slide and authorized Defendants to operate the slide. (Defs.' Br. at 9, Rogers Cert. ¶¶ 6-7.) Defendants further argue that the nature of injuries suffered on the Giant Slide are not serious, but minor.

Defendants direct this Court to *Pavlova v. Mint Management Corp .,* 868 A.2d 322 (N.J.Super.Ct.App.Div.2005), in which a state appellate court found a punitive damages award to be unsupported. In *Pavlova,* the Court considered an action stemming from a fire at a senior citizens' center in Edison Township, New Jersey. The fire began when a towel rack was ignited by a nearby wall-mounted heater and resulted in the death of the plaintiff. The Court noted that a few years before the fire, two other small fires had occurred at the building when the heaters ignited nearby materials. After these fires, the chief fire inspector suggested to the building's management that the towel racks be moved father from the heaters, or alternatively, that residents be made aware of the danger. The management responded by posting a notice on a common bulletin board but not by moving the towel racks.

In *Pavlova,* the plaintiff sought punitive damages not for the defendants' actual malice, but rather for recklessly maintaining the premises in a dangerous and defective condition. The Court held that punitive damages were not appropriate, noting that the evidence did not point to "the likelihood of serious and imminent harm, much less of defendant's awareness of that likelihood." *Id.* at 328. The Court also noted that the building was inspected each year by the Edison Fire Department and had never been cited for any fire code violations. Accordingly, while the

2007 WL 2159615

Court found that the defendants' conduct "may arguably amount to negligence, or even gross negligence ... it does not rise to the level of wanton and willful disregard of the likelihood, or high probability, of resultant serious harm."

In so holding, the Court distinguished the facts in *Pavlova* from those in other cases in which punitive damages were deemed to be warranted. In *Smith,* 734 A.2d 243, the Court found punitive damages to be properly available when an oil truck struck and killed a motorist when the truck's brakes failed. Noting that the defendant oil company knew of the problems with the brakes and allowed a virtually untrained driver to operate the truck, the Court found that the defendant's behavior justified an award of punitive damages. Similarly, in *Dong,* 824 A.2d 251, the Court found punitive damages to be justified in a case involving an intoxicated driver who swerved around a car that was stopped in front of it and struck a pedestrian. The Court in *Pavlova* found *Smith* and *Dong* to be distinguishable, for in *Pavlova* the Court found an absence of "blatantly egregious, deliberate conduct that was practically certain to cause both imminent and serious harm." *Id* . at 328.

**\*4** In the instant case, this Court similarly finds punitive damages to be unwarranted. Taking the facts in a light most favorable to Plaintiff, this Court finds that Plaintiff is unable to show, by clear and convincing evidence, that Defendants acted either with actual malice or with a wanton and willful disregard for the safety of Plaintiff and the amusement park's other visitors. The fact that during a two-year span, a handful of other riders also suffered injuries on the Giant Slide is insufficient to constitute clear and convincing evidence of Defendants' willful and wanton conduct. This Court finds the instant case to be similar to *Pavlova,* in that Defendants' inaction cannot be said to have been certain, or even likely, to cause imminent and serious harm. Additionally, as in *Pavlova,* the device in question had been subject to an annual inspection, which it had passed. While this Court finds that the facts presented by Plaintiff could suffice to show Defendants' negligence, they cannot be said to constitute clear and convincing evidence justifying an award of punitive damages.

## IV. CONCLUSION

Based on the foregoing reasoning, this Court will grant Defendants' motion for partial summary judgment and dismiss Plaintiff's claim for punitive damages. The accompanying Order shall issue today.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2159615

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT "I"

2017 WL 44850
**NOT FOR PUBLICATION**
United States District Court,
D. New Jersey.

Evan HUZINEC, Plaintiff,

v.

SIX FLAGS GREAT ADVENTURE, LLC, and Six
Flags Entertainment Corporation, Defendants.

Civ. Action No.: 16-2754 (FLW)(DEA)
|
Signed 01/03/2017

**Attorneys and Law Firms**

Michael F.J. Romano, Woodbury, NJ, for Plaintiff.

Heather M. Eichenbaum, Spector Gadon & Rosen, PC,
Philadelphia, PA, for Defendants.

**OPINION**

WOLFSON, United States District Judge:

**\*1** In this case, plaintiff Evan Huzinec ("Plaintiff")
alleges that he was struck on the head by a cellphone
while riding a roller coaster at Six Flags Great Adventure
("Six Flags"), an amusement park, located in New Jersey,
and, as a result, he sustained serious and permanent
injuries. Presently before the Court is a partial motion to
dismiss, pursuant to Federal Rule of Civil Procedure 12(b)
(6), filed by defendants Six Flags Great Adventure, LLC
and Six Flags Entertainment Corporations (collectively,
"Defendants"). Specifically, Defendants seek to dismiss
only Plaintiff's claims for breach of implied and express
warranty and fraudulent concealment; Defendants also
move to strike Plaintiff's request for punitive damages.
For the reasons set forth below, Defendants' motion is
**GRANTED**.

**I. FACTUAL BACKGROUND AND PROCEDURAL
HISTORY** [1]
Plaintiff visited Six Flags located in Jackson, New Jersey,
on July 5, 2014. Pl.'s Compl. at pg. 2, ¶ 2. According to
Plaintiff, he went to Six Flags as "a patron and business
invitee upon the premises...." Id. at pg. 3, ¶ 4. Plaintiff

alleges that, when he was riding a rollercoaster called
El Toro, he "was struck in the head, face and right eye
by a flying cellphone dropped by another patron on the
ride." See id. As a result, Plaintiff alleges that he sustained
serious injuries, including loss of vision in his right eye
and other permanent injuries. Id. at pg. 4, ¶ 6. Plaintiff
further alleges that he has suffered substantial pain and
suffering, and has required significant medical treatment.
Id. Prior to the filing of the Complaint, Plaintiff claims
that he sought certain information from Defendants
relating to the alleged accident, such as, inter alia, written
reports, video footage and the actual cellphone that
allegedly struck Plaintiff. Id. at pg. 5, ¶ 2–pg. 6, ¶ 5.
Plaintiff alleges that because Defendants did not respond
to his requests, Defendants have fraudulently concealed
relevant information concerning the incident. [2] Id. at pg.
6, ¶ 6.

**\*2** On May 16, 2016, Plaintiff filed his Complaint, which
asserts the following claims: Count One—negligence;
Count Two—breach of implied and express warranty;
Count Three—fraudulent concealment; Count Four—
gross negligence; [3] and Count Five—negligence against
Jane and/or John Does. On June 7, 2016, Defendants
filed a motion to dismiss only the claims for breach of
implied and express warranty, as well as the claim for
fraudulent concealment. In addition, Defendants seek to
strike punitive damages as a form of relief.

**II. STANDARD OF REVIEW**
Under Rule 12(b)(6), a complaint may be dismissed
for "failure to state a claim upon which relief can be
granted." Fed. R. Civ. P. 12(b)(6). When reviewing a
motion to dismiss on the pleadings, courts "accept all
factual allegations as true, construe the complaint in
the light most favorable to the plaintiff, and determine
whether, under any reasonable reading of the complaint,
the plaintiff may be entitled to relief." *Phillips v. Cnty.
of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal
quotation marks omitted). Under such a standard, the
factual allegations set forth in a complaint "must be
enough to raise a right to relief above the speculative
level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555
(2007). Indeed, "the tenet that a court must accept as
true all of the allegations contained in a complaint is
inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556
U.S. 662, 678 (2009). "[A] complaint must do more than
allege the plaintiff's entitlement to relief. A complaint has

to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The complaint must include "enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (internal quotation marks and citation omitted); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief.") (internal quotation marks and citation omitted).

**\*3** In sum, under the current pleading regime, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations marks and brackets omitted). Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." Id. (internal quotation marks omitted). Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. (internal quotation marks and brackets omitted).

### III. DISCUSSION

#### a. Breach of Implied Warranty
In Count Two of the Complaint, Plaintiff alleges that Defendants "expressly and/or impliedly warranted that its property, premises and roller coaster were safe and could be safely used by plaintiff and other similarly situated, were habitual and could be safely used by plaintiff and others similarly situated, were fit, suitable and/or safe for the purpose for which the property premises and rollercoaster were designed and/or intended, were fit, suitable and/or safe for the use in fact

made by plaintiff and were properly owned, operated, possessed, controlled, inspected, designed, managed and maintained." Pl.'s Compl. at pgs. 4-5, ¶ 2. Plaintiff further alleges that Defendants breached both express and implied warranties. [4] Id. at pg. 5, ¶ 3.

As to the breach of implied warranty claim, Defendants contend "there are no factual allegations demonstrating how and why the so-called implied warranties came into effect; what the plaintiff's reliance were; what warnings were provided and/or why such warnings were inadequate; and how said breach was the proximate cause of the plaintiff's alleged injuries." [5] Defs.' Br. at pgs. 5-6. In essence, Defendants take issue with the sufficiency of Plaintiff's pleading. Critically, however, Defendants did not raise the threshold—and more fundamental—issue whether the alleged incident can form the underlying basis for an implied warranty claim. Indeed, because Plaintiff did not purchase any "goods" within the definition set forth in N.J.S.A. 12A:2-105(1), Plaintiff's implied warranty claim fails as a matter of law.

**\*4** New Jersey's version of the Uniform Commercial Code ("UCC") provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." N.J.S.A. 12A:2-314(1); see *Marcus v. BMW of North America, LLC*, 687 F.3d 583, 600 n.8 (3d Cir. 2012). In order to be merchantable, the goods must be "fit for the ordinary purposes for which such goods are used." N.J.S.A. 12A:2-314(2)(c); see *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 370 (1960) (stating that this warranty "simply means that the thing sold is reasonably fit for the general purpose for which it is manufactured and sold."). By contrast, "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose." N.J.S.A. 12A:2-315; see *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 92 (3d Cir. 1983). Generally speaking, the purpose of these warranties is to "protect buyers from loss where the goods purchased are below commercial standards or are unfit for the buyer's purpose." *Altronics of Bethlehem, Inc. v. Repco, Inc.*, 957 F.2d 1102, 1105 (3d Cir. 1992). [6] Both types of implied warranty claims involve "goods" as defined under

N.J.S.A. 12:2-105(1). Indeed, the New Jersey UCC only "applies to transactions in goods." N.J.S.A. 12A:2-102; see *Paramount Aviation Corp. v. Agusta*, 288 F.3d 67, 72 (3d Cir. 2002). And, "goods" are defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities ... and things in action." N.J.S.A. 12A:2-105(1); see *New Skies Satellites, B.V. v. Home2US Commc'ns*, 9 F. Supp. 3d 459, 468-69 (D.N.J. 2014).

In his Complaint, Plaintiff does not make clear what transaction forms the basis of his claim for breach of implied warranty. While Plaintiff does not expressly allege that he purchased a ticket to enter Six Flags, he alleges that he "was a patron and business invitee" of the amusement park on the date of the incident. See Pl.'s Compl. at pg. 3, ¶ 4. Based on that allegation, the only plausible interpretation is that Plaintiff's purchase of the admissions ticket, which allowed him access to attractions such as El Toro, constitute "goods" under the UCC.

While no New Jersey state or federal court has directly addressed the issue whether the purchase of an admission ticket to an amusement park falls within the definition of "goods," a court in the Eastern District of Pennsylvania has considered that issue. In *Rossetti v. Busch Entertainment Corp.*, 87 F. Supp. 2d 415 (E.D. Pa. 2000), the plaintiff alleged that she paid an admission fee to enter an amusement park, and while she was riding an attraction, she sustained injuries when the raft that she was riding "rose and came down hard, jolting plaintiff." Id. at 416-417. Among other claims, the plaintiff asserted that the defendant breached its warranty of merchantability or fitness for use. Id. at 417. In granting summary judgment against the plaintiff, the court characterized the purchase of an admission ticket as the operative transaction between the parties with respect to the breach of warranty claim, but held that "the purchase of an admission ticket to an amusement park that enables a patron to ride attractions does not constitute 'goods' pursuant to the UCC." [7] Id. at 418. In reaching that conclusion, the court relied in part on *Dantzler v. S.P. Parks, Inc.*, No. 87-4434, 1988 WL 131428, at *5 (E.D. Pa. Dec. 6, 1988), which similarly concluded that, with respect to a breach of warranty claim, "the right to enter an amusement park and the right to participate in its various rides and diversions are what plaintiff purchased. This does not come within the definitions of 'goods'...."

*Rossetti*, 87 F. Supp. 2d at 417-18; see also *Coppersmith v. Herco, Inc.*, 29 Pa. D. & C. 4th 73, 81 (Com. Pl. 1996) (finding that plaintiff's ride in raft was "not the type of transaction with attributes similar to a sale of goods" and thus article 2 warranty provisions could not apply).

**\*5** Similar to the plaintiff in *Rossetti*, Plaintiff, here, presumably purchased a ticket to enter Six Flags. It is beyond dispute that the ticket itself did not cause any harm to Plaintiff. Rather, the admission ticket simply memorialized, in writing, Plaintiff's right to enter the amusement park and the right to ride on the roller coasters and partake in other activities; those rights are what Plaintiff purchased. However, this type of transaction does not fall within the definition of "goods" under N.J.S.A. 12A:2-105(1), because in order to be a 'transaction in goods,' the subject matter of the transaction—the putative good—must be tangible and movable. The subject matter of the transaction alleged here, i.e., riding on a roller coaster, does not meet this criterion. Therefore, the UCC is inapplicable and Plaintiff's claim for breach of implied warranty claim must necessarily fail. [8]

### b. Breach of Express Warranty

Defendants argue that Plaintiff has failed to sufficiently allege a claim for breach of express warranty because Plaintiff does not identify the specific affirmation, promise or description giving rise to such a warranty. In particular, Defendants contend that "there are no factual allegations regarding the content of this express warranty; and who said what to whom, where, when and how are all unstated." Defs.' Br. at pg. 7. Once again, Defendants have failed to address the threshold issue whether Plaintiff purchased "goods" in connection with his express warranty claim. Express warranties, like implied warranties, are also governed by the UCC, which provides in relevant parts:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

N.J.S.A. 12A:2-313(1)(a)-(c); see Snyder v. Farnam Cos., 792 F. Supp. 2d 712, 721 (D.N.J. 2011); Peruto v. TimberTech Ltd., 126 F. Supp. 3d 447, 455 (D.N.J. 2015). Correspondingly, the definition of "goods" under N.J.S.A. 12A:2-105(1) applies in the context of express warranties. But, as discussed supra, Plaintiff did not purchase any "goods" under N.J.S.A. 12A:2-105(1). See Oscar Mayer Corp. v. Mincing Trading Corp., 744 F. Supp. 79, 83 (D.N.J. 1990) (stating that the UCC, including its definitions, governs both claims for breach of express and implied warranty). Rather, he purchased a ticket that granted him the access to Six Flags and its attractions. The alleged transaction simply does not fall within the UCC. Accordingly, for the same reasons why Plaintiff's implied warranty claim fails, Plaintiff cannot state a claim for breach of express warranty as a matter of law.

**c. Fraudulent Concealment**

In Count Three, Plaintiff generally alleges that Defendants fraudulently concealed evidence from Plaintiff, including written reports and video footage of the incident at issue here. See Pl.'s Compl. at pg. 6, ¶ 4. In addition, Plaintiff alleges that Defendants have failed to provide the identity of the individual that dropped his or her cellphone while on El Toro. See id. Defendants argue that Plaintiff has prematurely asserted his claim of fraudulent concealment, since this litigation has just commenced and discovery has not yet begun. Furthermore, Defendants contend that Plaintiff has failed to state a claim for fraudulent concealment under the heightened pleading standard of Federal Rule of Civil Procedure 9(b), reasoning that Plaintiff's allegations of concealment are conclusory and they lack the required specificity. In opposition, Plaintiff does not address Defendants' argument that his claim for fraudulent concealment is premature. Rather, Plaintiff argues that he has satisfied the heightened pleading requirements, since "defendants have intentionally concealed, despite request, the identity of the owner of the phone which struck plaintiff in the head, failed to identify the tour group which the owner of the phone was a member[,] and has failed to even provide the identities of parties which participated in the ownership, operation, management and control of the

theme park which plaintiff patronized." Pl.'s Br. in Opp. at pg. 11.

*6 Spoliation "is the term that is used to describe the hiding or destroying of litigation evidence, generally by an adverse party." Rosenblit v. Zimmerman, 166 N.J. 391, 400-01 (2001). In order to remedy spoliation, a litigant is allowed to file a separate tort action for fraudulent concealment against an adversary that hides or destroys evidence during or in anticipation of litigation. See id. at 403, 406-07; Williams v. BASF Catalysts LLC, 765 F.3d 306, 320 (3d Cir. 2014) ("New Jersey permits plaintiffs to recover in an independent action for harm caused in a prior proceeding by an adversary's spoliation."). In order to prove fraudulent concealment, the plaintiff must establish five elements:

(1) That defendant in the fraudulent concealment action had a legal obligation to disclose evidence in connection with an existing or pending litigation;

(2) That the evidence was material to the litigation;

(3) That plaintiff could not reasonably have obtained access to the evidence from another source;

(4) That defendant intentionally withheld, altered or destroyed the evidence with purpose to disrupt the litigation;

(5) That plaintiff was damaged in the underlying action by having to rely on an evidential record that did not contain the evidence defendant concealed.

Rosenblit, 166 N.J. at 406-07. In addition, when the spoliation is discovered during the pendency of the litigation, the court is empowered to make use of an adverse inference or order discovery sanctions to remedy spoliation. See id. at 401-03; see also Tartaglia v. UBS PaineWebber, Inc., 197 N.J. 81, 119 (2008). The purpose of these remedies "is to make whole, as nearly as possible, the litigant whose cause of action has been impaired by the absence of crucial evidence; to punish the wrongdoer; and to deter others from such conduct." Rosenblit, 166 N.J. at 401.

In Tartaglia, the New Jersey Supreme Court explained that "the time when an act of spoliation is discovered will indeed strongly suggest the appropriate course of action in that case." Tartaglia, 197 N.J. at 122. While the Court did not address the appropriate course of

action if spoliation is discovered before the institution of the action, the Court, nonetheless, explained that, "[i]f the spoliation is discovered while the underlying litigation is ongoing, the adverse inference [or discovery sanctions] may be invoked and the party is permitted to amend the complaint to add a count for fraudulent concealment, but the counts must then be bifurcated." Id. at 118-19. In addition, if the spoliation is discovered after the completion of the underlying action, a litigant can still bring a separate claim for fraudulent concealment. Id. at 119. The Court reasoned that "the subsequent prosecution of the bifurcated claim will not create a duplicative recovery because the focus in that proceeding will be on the damages, both compensatory and punitive, incurred in having to proceed without the destroyed evidence." Id. at 120. Indeed, the Court explained that, [a]lthough some courts have held that the availability of the bifurcated cause of action turns on whether plaintiff succeeds on the substantive claim itself ... we see them as different remedies serving different purposes." Id. at 121. Based on Rosenblit and its progeny, Plaintiff, here, is permitted to assert a separate claim for fraudulent concealment, and there appears to be no timing restrictions on when he can file that claim against Defendants, aside from having to properly plead such a claim.

In the instant matter, both parties agree that Rule 9(b) applies to Plaintiff's claim for fraudulent concealment. See *Williams v. BASF Catalysts LLC*, No. 11-1754, 2016 WL 1367375, at *8 (D.N.J. Apr. 5, 2016) (applying Rule 9(b) to a claim for fraudulent concealment). Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). A plaintiff must state the circumstances of the alleged wrongdoing with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged. See *Frederico*, 507 F.3d at 200. However, "[c]ourts must be sensitive to the fact that application of Rule 9(b) prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (internal quotation marks and citation omitted).

*7 In his Complaint, Plaintiff alleges that he reported his injuries to an employee at Six Flags after the incident occurred, see Pl.'s Compl. at pg. 5, ¶ 2, and that Six Flags produced "written reports concerning the accident and confirming the identity of the patron which dropped the

cellphone causing plaintiff's injuries." Id. at pg. 6, ¶ 4. Plaintiff further alleges that Six Flags maintained video surveillance of the operation of the rollercoaster, see id. at pg. 5, ¶ 3, and that Six Flags is in possession of the actual cellphone that struck Plaintiff in the face. Id. at pg. 6, ¶ 4. In a somewhat contradictory manner, Plaintiff alleges that Six Flags has "failed to maintain, preserve and provide to plaintiff the video surveillance tapes, the cellphone, the written reports, the identity of the individual who dropped the cellphone and evidence in their possession memorializing the accident and injuries to plaintiff." Id. at 6, ¶ 5.

Based on those allegations, it is unclear whether Plaintiff is alleging that Defendants possessed the evidence, but have subsequently destroyed it, or whether Defendants possess the evidence, but have failed to provide it to Plaintiff prior to the filing of the Complaint or discovery. To the extent that Plaintiff intended to allege that Defendants have destroyed evidence prior to the start of litigation, Plaintiff simply has not pled Defendants' concealment in that regard with particularity. To the extent Plaintiff alleges that Defendants have not turned over the evidence that Plaintiff sought prior to the filing of the Complaint, Plaintiff has failed to allege any legal obligation on the part of Defendants to fulfill Plaintiff's requests for evidence outside of the discovery process.

Indeed, since the filing of Plaintiff's Complaint, the parties have not attended an initial scheduling conference with the Magistrate Judge, and discovery has not commenced. Assuming Defendants are still in possession of the evidence which Plaintiff seeks, Plaintiff has not identified any source of authority imposing a legal obligation on Defendants to produce the requested evidence to Plaintiff —prior to the filing of the Complaint and the start of discovery. See *Rosenblit*, 166 N.J. at 406-07 (stating that one of the elements of fraudulent concealment is that the defendant "had a legal obligation to disclose evidence in connection with an existing or pending litigation"). At this stage of the litigation, this Court has no basis to find on a motion to dismiss that Defendants will not comply with their discovery obligations in good faith; nor can Plaintiff plausibly allege such non-compliance because discovery has not commenced.

Accordingly, Plaintiff's claim for fraudulent concealment in Count Three is dismissed without prejudice. However, if Plaintiff learns in discovery that Defendants have hidden

or destroyed evidence in connection with this litigation, he may seek leave to amend his Complaint.

#### d. Punitive Damages

Defendants makes two arguments with respect to punitive damages. First, Defendants argue that Plaintiff has failed to specifically request punitive damages in the Complaint, even though Plaintiff sets forth various terms and legal conclusions that often denote such a request. As such, Defendants request that this Court "strike from the Complaint all allegations sounding [in] recklessness and punitive damages," including the following terms: (i) willful, (ii) wanton, (iii) reckless; and (iv) intentional. Defs.' Br. at pg. 12. Second, assuming that Plaintiff has requested punitive damages, Defendants contend that Plaintiff has failed to allege sufficient facts and circumstances to establish that Defendants acted with willful and wanton disregard.

Despite Defendants' contention to the contrary, Plaintiff expressly seeks punitive damages in connection with his claim for fraudulent concealment in Count Three, as well as his claim for gross negligence in Count Four. See Pl.'s Compl at pg. 6, ¶ 1–pg. 7, ¶ 3. Nevertheless, because Plaintiff's claim for fraudulent concealment in Count Three has been dismissed, it follows that his request for punitive damages in Count Three is also dismissed. See Hassoun v. Cimmino, 126 F. Supp. 2d 353, 372 (D.N.J. 2000); see also Priore v. Caravan Ingredients, Inc., No. 13-5229, 2014 WL 2931182, at *6 (D.N.J. Jun. 30, 2014) ("As the substantive counts fail to state a claim, [punitive damages] will likewise be dismissed."). However, if Plaintiff at some point amends his Complaint to add a

claim for fraudulent concealment, he is permitted to seek punitive damages as a form of relief. See Tartaglia, 197 N.J. at 121.

**\*8** Furthermore, under New Jersey law, Plaintiff is prohibited from seeking punitive damages in connection with his claim for gross negligence in Count Four. See Schillaci v. First Fid. Bank, 311 N.J. Super. 396, 402 (App. Div. 1998) ("Punitive damages cannot be awarded for negligence or even for gross negligence."); Edwards v. Our Lady of Lourdes Hosp., 217 N.J. Super. 448, 460 (App. Div. 1987) ("Neither mere negligence nor gross negligence can support an award of punitive damages."); see also N.J.S.A. 2A:15-5.12 ("This burden of proof [for punitive damages] may not be satisfied by proof of any degree of negligence including gross negligence."). Therefore, Plaintiff's request for punitive damages in Count Four is dismissed.

#### IV. CONCLUSION

For the reasons set forth above, Defendants' partial motion to dismiss is granted. Specifically, Plaintiff's claims for breach of implied and express warranty are dismissed as a matter of law. Plaintiff's claim for fraudulent concealment and his request for punitive damages in Count Three are dismissed without prejudice. Finally, Plaintiff's request for punitive damages in Count Four is dismissed.

#### All Citations

Slip Copy, 2017 WL 44850, 91 UCC Rep.Serv.2d 646

---

#### Footnotes

1   I note that Plaintiff does not number the paragraphs in his Complaint sequentially. Rather, at the beginning of each count, Plaintiff restarts his numbering, thereby repeating certain paragraph numbers multiple times within his Complaint. For the sake of clarity, I will cite each paragraph in the Complaint by page number as well as the paragraph number. On this motion, I will take those factual allegations as true.

2   In his opposition brief, Plaintiff states that his counsel sent Defendants two letters in April 2016—prior to the filing of the Complaint—requesting certain information relating to the alleged incident. Pl.'s Br. in Opp. at pg. 5. Plaintiff sent a similar request to Defendants in May 2016—after the filing of the Complaint—because Defendants "refused to provide the information." Id. at pgs. 5-6. The Court cannot consider these allegations because they do not appear in the Complaint. See Frederico v. Home Depot, 507 F.3d 188, 201-02 (3d Cir. 2007). Nor can the Court consider the letters that Plaintiff attached as exhibits to his opposition brief, since they are not exhibits to the Complaint. See Marks v. Struble, 347 F. Supp. 2d 136, 143 (D.N.J. 2004) (stating that, on a motion to dismiss, courts "generally only considers the allegations in the complaint, exhibits attached to the complaint, and public records," and that courts cannot consider matters extraneous to the pleadings).

3    Although Count Four is not a model of clarity, Plaintiff appears to assert a claim for gross negligence against Defendants. Specifically, Plaintiff alleges that Defendants,

> ... acted willfully, wantonly and intentionally in the ownership, operation, possession, control, inspection, design, management and maintenance of their premises and the "El Toro" roller coaster when adopting and implementing policies and procedures for the use of its premises and amusement rides including the "El Toro" roller coaster, by knowingly and intentionally adopting and implementing defective policies, by failing properly to train and supervise its employees, by failing to provide proper safe guards to plaintiff and by otherwise acting willfully, wantonly and intentionally under the circumstances.

Pl.'s Compl. at pg. 7, ¶ 2; *see Smith v. Kroesen,* 9 F. Supp. 3d 439, 444 (D.N.J. 2014) (finding that "[g]ross negligence [as a claim] requires substantial proof beyond simple negligence; it requires wanton or reckless disregard for the safety of others."). Indeed, while Plaintiff uses words such as "intentionally" in his Complaint, in Plaintiff's opposition brief, he made clear that Count Four involves conduct by Six Flags that was allegedly wanton and reckless. See Pl.'s Br. in Opp. at pg. 12. Thus, Plaintiff's allegations in that regard form the basis of a gross negligence claim. See *Smith,* 9 F. Supp. at 444.

4    With respect to his breach of implied warranty claim, Plaintiff does not specify whether he is asserting a claim for breach of merchantability or breach of fitness for a particular purpose.

5    Defendants also argue that Plaintiff's claim for breach of implied warranty should be dismissed because the New Jersey Product Liability Act ("PLA"), N.J.S.A. 2A:58C-1, et seq., expressly subsumes all common law claims for breach of implied warranty. The PLA provides that "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty," is subsumed by the statute. N.J.S.A. 2A:58C-1(b)(3); see *Worrell v. Elliot & Frantz,* 799 F. Supp. 2d 343, 350 (D.N.J. 2011); see also *Clements v. Sanofi-Aventis,* U.S., Inc., 111 F. Supp. 3d 586, 596 (D.N.J. 2015). Since the passage of the PLA, "breach of implied warranty [claims] are no longer viable as separate causes of action for harm caused by a product." *Worrell,* 799 F. Supp. 2d at 351; see *Repola v. Morbark Indus., Inc.,* 934 F.2d 483, 492 (3d Cir. 1991); see also *In re Lead Paint Litig.,* 191 N.J. 405, 436–47 (2007). However, the PLA subsumes a claim only if "the essential nature of the claim presented ... would traditionally be considered a products claim." *Worrell,* 799 F. Supp. 2d at 351 (internal quotation marks and citations omitted); see *Sinclair v. Merck & Co.,* 195 N.J. 51, 66 (2008). For example, if a plaintiff alleges "that the product was not reasonably fit, suitable or safe for its intended purpose because it either contained a manufacturing defect, failed to contain adequate warnings or instructions, or was designed in a defective manner," the PLA subsumes the claim. *Koruba v. Am. Honda Motor Co.,* 396 N.J. Super. 517, 531 (App. Div. 2007) (quoting N.J.S.A. 2A:58C-2); see *Mendez v. Shah,* 28 F. Supp. 3d 282, 296 (D.N.J. 2014). But, if the plaintiff alleges that the harm was not caused by a defect inherent in the product, the PLA does not subsume the claim. See *Worrell,* 799 F. Supp. 2d at 353; *Universal Underwriters Ins. Group v. Public Serv. Elec. & Gas Co.,* 103 F. Supp. 2d 744, 748 (D.N.J. 2000).

> Although Plaintiff insists that he is not asserting a products liability claim, it is unclear from the Complaint what type of claim Plaintiff intended to bring in Count Two. Plaintiff alleges that Defendants breached the implied warranty because their "property, premises and roller coaster ... were not habitual, fit, suitable and/or safe for the purpose for which ... [they] were designed and/or intended...." Pl.'s Compl. at pg. 5, ¶ 3. Such allegations clearly sound in products liability. However, in the same cause of action, Plaintiff also alleges that Defendants' "property, premises and roller coasters ... were not properly owned, operated, possessed, inspected, controlled ... and maintained." Id. Those allegations, however, are more akin to a negligence claim. Because the allegations in the Count Two are unclear, the Court cannot determine the nature of Plaintiff's implied warranty claim in connection with the subsumption analysis. In any event, the Court does not need to reach that issue because, as discussed infra, Plaintiff cannot state a claim for breach of implied warranty as a matter of law.

6    Plaintiff does not specify which type of implied warranty claim he is bringing.

7    Even though the court applied Pennsylvania law, the statute defining "goods" in Pennsylvania is nearly identical to the New Jersey statute. The Pennsylvania statute states, in pertinent part:

> "Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Division 8) and things in action.

13 Pa.C.S. § 2105(a).

8    To be clear, Plaintiff does not allege that he purchased any other goods from Defendants that may form the basis for his warranty claims.

Huzinec v. Six Flags Great Adventure, LLC, Slip Copy (2017)

2017 WL 44850, 91 UCC Rep.Serv.2d 646

---

End of Document

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "J"

2017 WL 2625965
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of New Jersey,
Appellate Division.

CHEE LI and Feng Li, Plaintiffs–Appellants,

v.

BMW OF NORTH AMERICA,
LLC, Defendant–Respondent.

Submitted January 31, 2017
|
Decided June 19, 2017

On appeal from the Superior Court of New Jersey, Law
Division, Morris County, Docket No. L–3014–13.

**Attorneys and Law Firms**

Chee Li and Feng Li, appellants pro se.

Lindabury, McCormick, Estabrook & Cooper, P.C.,
Westfield, attorneys for respondent (Steven A.
Andreacchi, of counsel and on the brief).

Before Judges Ostrer and Vernoia.

**Opinion**

PER CURIAM

*1 Plaintiffs, appearing pro se, appeal an August 17,
2015 order dismissing plaintiff Feng Li's claims due to
a lack of standing, and a May 28, 2015 order granting
defendant's request to limit plaintiffs' written discovery
demands. Based on our review of the record under the
applicable law, we affirm.

## I.

The material facts are not in dispute. On November 11,
2013, plaintiffs Chee Li (Chee) and her husband Feng
Li (Feng),[1] filed a pro se complaint against defendant
BMW of North America, LLC, alleging that in February
2011 plaintiffs purchased a defective vehicle from a local

BMW dealership (dealership). The vehicle was covered
by defendant's warranty agreement "against defects in
materials or workmanship to the first retail purchaser,
and each subsequent purchaser," for a period of "forty-
eight months or 50,000 miles, whichever occurs first."
Plaintiffs claimed that following the purchase, defendant
refused to honor the warranty agreement when the vehicle
experienced ongoing mechanical issues related to oil
usage.

Plaintiffs filed a complaint alleging defendant sold the
vehicle knowing it was defective, and breached the
warranty agreement by refusing to repair the alleged
defect. Plaintiffs asserted the following five claims:
violations of the Magnuson–Moss Warranty Federal
Trade Commission Improvement Act (MMWA), 15
*U.S.C.A.* §§ 2301 to 2312, (count one); breach of express
warranty (count two); breach of the implied covenant of
good faith and fair dealing (count three); violations of the
New Jersey Consumer Fraud Act (CFA), *N.J.S.A.* 56:8–
1 to –20, (count four); and breach of the implied warranty
of merchantability (count five).

Several disputes between the parties arose during
discovery. Plaintiffs opposed defendant's request that
its expert inspect the vehicle outside of plaintiffs'
presence. Defendant claimed plaintiffs' service of 318
interrogatories and fifty-three document demands was
excessive. Defendant moved to compel plaintiffs to
produce the vehicle for inspection, plaintiffs cross-moved
to permit their presence at the vehicle inspection, and
defendant moved for a protective order limiting plaintiffs'
discovery requests.

On May 28, 2014, the court entered an order granting
defendant's motions and denying plaintiffs' cross-motion.
In a written decision the judge found plaintiffs failed
to demonstrate good cause for allowing their presence
at the vehicle inspection, relying upon the standard set
forth in *Briglia v. Exxon Co., USA*, 310 *N.J. Super.* 498,
502–03 (Law Div. 1997).[2] The court also determined
plaintiffs' discovery demands were excessive and limited
plaintiffs' discovery requests to twenty-five interrogatories
and fifteen document demands.

The discovery exchanged between the parties revealed that
the retail installment contract, purchase documentation,
and vehicle title listed Chee as the vehicle's purchaser.
Defendant moved to dismiss Feng's claims, arguing he

lacked standing to prosecute the causes of action in the complaint, and that Feng, a disbarred New Jersey attorney, [3] was engaged in the unauthorized practice of law by acting as counsel for the vehicle's purchaser, Chee.

**\*2** Following oral argument on defendant's motion, the court held an evidentiary hearing on "the issue of whether Feng [ ] has [an] ownership interest in the [vehicle] that is the subject of this action and/or standing to maintain this action." On August 6, 2015, the court summarized the facts developed at the evidentiary hearing and issued an oral decision.

As explained by the court, Feng testified he and Chee purchased the vehicle for his use, and Chee owned a separate vehicle. Feng testified he negotiated the purchase of the vehicle with a dealership sales representative, but did not qualify for the necessary financing. Feng explained that arrangements were then made for Chee to purchase the vehicle, as she qualified for the financing. The paperwork for the purchase and financing were made in Chee's name, and the motor vehicle title and registration were issued to Chee. Feng testified that he later "attempted to have his name put on the certificate of title, but [defendant] refused."

Feng testified that "the purpose of the acquisition of the car was so ... he could drive it." Feng incurs all of the maintenance costs on the vehicle, and Chee makes the monthly financing payments with money Feng provides to her. Chee testified "that she does not drive" the car and that Feng "pays for the car in the sense that he transfers money to her, which she then forwards along ... electronically, to [defendant]."

Plaintiffs introduced evidence showing Feng is the named insured on the insurance policy for the vehicle. Plaintiffs also introduced several invoices for the vehicle's maintenance that Feng signed, and documents showing he was loaned a temporary vehicle while the vehicle was under maintenance.

Plaintiffs also filed a pleading dated October 10, 2014, which they signed and entitled "Affidavit of Sale Agreement Between Plaintiffs Chee Li and Feng Li" (Affidavit of Sale). The document appears to be both a purported affidavit, [4] asserting Chee and Feng were the joint purchasers of the vehicle, and a form of contract by which Chee purports to transfer to Feng all of her claims

and causes of action against defendant, and her rights under the vehicle's warranty.

The contract documents related to the financing and purchase of the vehicle showed Chee was the purchaser, she solely applied for the financing, and the certificate of title was in her name. The retail installment contract listed Chee as the "buyer," included an acknowledgement that Chee was "purchasing the vehicle," and was signed by Chee. The agreement included provisions stating that Chee understood she had "no right to assign any of [her] rights under" the contract, that the contract "described all of the agreements with respect to the retail installment sale of the [v]ehicle between [the] [s]eller and [Chee]," and that "all prior agreements, whether oral or in writing, are superseded."

The court considered the evidence submitted and determined that Feng lacked standing to assert the causes of action in the complaint. The court found Feng "is not a real party in interest," or "a consumer as defined by the Lemon Law [5] or [MMWA]." The court rejected Feng's claim he was a co-owner of the vehicle and determined Chee was the vehicle's sole owner because:

> **\*3** [H]ere we have a certificate of title in the name of [Chee]; a purchase invoice in the name of [Chee]; a copy of a purchase order in the name of [Chee]; the temporary registration and license tag in [Chee's] name; the odometer disclosure statement, which is signed by [Chee] as transferee; the ... BMW [f]inancial [s]ervices consumer credit application, which is in [Chee's] name; and there is no co-applicant; and a BMW [f]inancial [s]ervices motor vehicle retail installment contract, which memorializes the loan in the name of [Chee].

The court rejected Feng's claim that by negotiating the vehicle's purchase and making monthly payments to his wife, he had standing. The court rejected Feng's reliance on the purported Affidavit of Sale agreement, noting it was contrary to the language of Chee's retail installment contract with defendant, which precluded the assignment of any of her rights, including "the right to pursue the

remedy under the [ ] warranty." The court concluded Feng was not the purchaser of the vehicle or a transferee of the vehicle's title, and therefore he lacked standing to prosecute the claims asserted in the complaint. The court entered an August 17, 2015 order dismissing Feng's claims.

Prior to the court's ruling, Chee's complaint was dismissed pursuant to *Rule* 4:21A–4(f) for failure to appear for a court-ordered mandatory non-binding arbitration. The court entered a July 9, 2015 order dismissing Chee's claims. Ignoring the court's order, Chee filed a notice of demand for a trial de novo on August 4, 2015, but the notice was returned by the court on August 12, 2015.

Plaintiffs filed the present appeal challenging the May 28, 2014 discovery order, and the August 17, 2015 order dismissing the complaint as to Feng. Plaintiffs did not appeal the court's July 9, 2015 order dismissing Chee's claims pursuant to *Rule* 4:21A–4(f). [6]

## II.

We first address plaintiffs' argument the court erred by dismissing Feng's claims due to a lack of standing. We conduct a de novo review of the orders dismissing claims for lack of standing. *Courier–Post v. Cty. of Camden*, 413 *N.J. Super.* 372, 381 (App. Div. 2010) ("The issue of standing presents a legal question subject to [an appellate court's] de novo review."). However, when the court conducts an evidentiary hearing, we are bound by its factual findings that are supported by substantial credible evidence in the record. *See Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.*, 65 *N.J.9* 474, 483–84 (1974).

**\*4** The issue of standing involves a threshold determination of the trial court's power to hear the case. *N.J. Citizen Action v. Riviera Motel Corp.*, 296 *N.J. Super.* 402, 410 (App. Div.), *certif. granted*, 152 *N.J.* 13 (1997), *appeal dismissed*, 152 *N.J.* 361–62 (1998). We have adopted a "broad and liberal approach" on the issue of standing by a party to maintain an action before the court. *Garden State Equal. v. Dow*, 434 *N.J. Super.* 163, 197 (App. Div.), *certif. granted*, 216 *N.J.* 1, *stay denied*, 216 *N.J.* 314 (2013). Generally, "a plaintiff must have a 'sufficient stake in the outcome of the litigation, a real adverseness with respect to the subject matter, and there must be a substantial likelihood that the plaintiff will suffer harm in the event of an unfavorable decision.' "

*Ibid.* (quoting *N.J. Citizen Action, supra*, 296 *N.J. Super.* at 409–10).

Although our courts apply a broad approach to standing, it is not automatic. *EnviroFinance Grp., LLC v. Environmental Barrier Co. LLC*, 440 *N.J. Super.* 325, 340 (App. Div. 2015). "[A] litigant usually has no standing to assert the rights of a third party." *Bondi v. Citigroup, Inc.*, 423 *N.J. Super.* 377, 436 (App. Div. 2011), *certif. denied*, 210 *N.J.* 478 (2012); *Jersey Shore Med. Center–Fitkin Hosp. v. Estate of Baum*, 84 *N.J.* 137, 144 (1980). Moreover, a plaintiff has no standing to assert a statutory claim where standing is not conferred or implied by the statute. *See Crusco v. Oakland Care Center Inc.*, 305 *N.J. Super.* 605, 614–15 (App. Div. 1997); *Lascurain v. City of Newark*, 349 *N.J. Super.* 251, 274–75 (App Div. 2002) (finding plaintiff lacked standing to bring suit under the New Jersey Cemetery Act, *N.J.S.A.* 8A:1–1 to –12–6, because the statute did not authorize actions by private parties); *Middlesex Cty. Bar Ass'n v. Parkin*, 226 *N.J. Super.* 387, 392–93 (App. Div.) (finding plaintiff lacked standing to institute proceeding to remove worker's compensation judges because the constitutional and statutory authority for removal was vested in the Governor and Commissioner of the Department of Labor), *certif. denied*, 113 *N.J.* 380 (1988).

Here, we first consider Feng's claim the court erred by finding he lacked standing to prosecute the alleged violation of the MMWA under count one of the complaint. "[T]he [MMWA] permits 'a consumer who is damaged by the failure of [a] ... warrantor ... to comply with any obligation under ... a written warranty [or] implied warranty ...' to sue warrantors for damages and other relief including attorneys' fees." *Ryan v. Am. Honda Motor Corp.*, 186 *N.J.* 431, 434 (2006) (quoting 15 *U.S.C.A.* § 2310(d)(1), (2)).

"[T]o invoke the provisions of the Act, a plaintiff must fall within one of [the following] three definitions of 'consumer' ":

(1) "a buyer (other than for purposes of resale) of any consumer product";

(2) "any person to whom such product is transferred during the duration of an implied or written warranty ... applicable to the product"; or

(3) "any other person who is entitled by the terms of such warranty ... or under applicable State law to enforce against the warrantor ... the obligations of the warranty."

[*Ibid.* (quoting 15 *U.S.C.A.* § 2301(3).]

Feng contends he has standing to prosecute his MMWA claim because he qualifies as a consumer within each of the three statutory categories of the MMWA. He claims the court erred by holding otherwise. We disagree.

The evidence supports the court's determination Feng was not a buyer of the vehicle and thus did not qualify as a category one consumer. Feng acknowledges he could not buy the vehicle because he was not financially able to do so. As a result, he arranged for Chee to purchase the vehicle. She obtained the financing, the retail installment agreement identifies her as the buyer, and the title of the vehicle was issued to her alone.

**\*5** There is also no evidence supporting Feng's claim he qualifies as a category two consumer as a transferee of the vehicle during the warranty period. 15 *U.S.C.A.* § 2301(3). In order to qualify as a category two consumer, Feng is required to establish he was a "person to whom [the vehicle was] transferred during the duration of an implied or written warranty." *Ibid.*

Here, the title to the vehicle remained at all times in Chee's name, there was no evidence Chee transferred any legal right to the possession or use of the vehicle to Feng, and Chee was prohibited by the retail installment contract from transferring the vehicle without defendant's authorization, which Feng sought, but which defendant denied.

We reject Feng's argument that the Affidavit of Sale demonstrates a transfer of the vehicle from Chee to Feng. Apparently aware that a transfer of the vehicle is prohibited by Chee's retail installment contract and would constitute a default under the agreement, the affidavit memorializes a putative sale only of Chee's "[c]ontract[ ] warranty, [c]laims and [c]auses of [a]ction" against defendant and others. The affidavit, to the extent it also constitutes a contract, simply does not transfer to Feng any legal right to the vehicle.

We also reject Feng's argument he was a transferee within the meaning of the MMWA based on his exclusive use of the vehicle following its purchase. His argument is unencumbered by citation to any legal authority supporting the notion that a transfer pursuant to section 2301(3) of the MMWA occurs when a vehicle owner permits another to use it. In support of his position, Feng relies only upon the court's analysis of category three consumers in *Voelker v. Porsche Cars N. Am., Inc.,* 353 F.3d 516, 524–27 (7th Cir. 2003), which has no application to Feng's contention he qualifies as a category two consumer.

In *Voelker,* the court rejected the plaintiff's claim he was a category two consumer, but not based on the lack of a transfer of the vehicle. *Id.* at 524. The court considered whether plaintiff's entry into the lease for the vehicle with the lessor was a transfer of the vehicle under section 2301(3) of the MMWA. *Ibid.* The court determined the plaintiff was not a category two consumer, because the transfer by way of the lease did not occur "during the duration of" the warranty as required by the statute. *Ibid.* Feng does not claim to be a lessee and, thus, *Voelker* does not support his contention he is a category two consumer.

In *Ryan v. Am. Honda Motor Corp.,* 376 N.J. Super. 185, 187–89 (App. Div. 2005), *aff'd as modified,* 186 N.J. 431 (2006), we considered whether a lessee of a motor vehicle qualified as a category two consumer under the MMWA. We explained there was a conflict among the courts addressing the issue, with some courts determining a lessee could not qualify as a second category consumer because the statute required a transfer involving a sale and passing of title to the transferee. *Id.* at 193–94; *see also DiCintio v. DaimlerChrysler Corp.,* 768 N.E.2d 1121, 1126–27 (2002). We also explained other courts have held that if warranties are issued initially as part of a sale, a subsequent lessee of the vehicle qualifies as a category two consumer if the lessee leases and takes possession of the vehicle during the duration of the warranties. *Id.* at 197–98; *see, e.g., Voelker, supra,* 353 F.3d at 524; *Parrot v. Daimler–Chrysler,* 108 P.3d 922 (App. 2005); *Mangold v. Nissan N. Am., Inc.,* 809 N.E.2d 251 (2004).

**\*6** We reasoned that the latter cases represented the more accurate interpretation of 15 *U.S.C.A.* § 2301(3), and concluded lessees could qualify as category two consumers. *Id.* at 197–99. In a per curiam decision on the defendants' appeal, the Supreme Court stated it would not

address our conclusion concerning the qualifications for category two consumers, and affirmed solely on the basis of our separate determination that the plaintiff qualified as a category three consumer. *Ryan, supra,* 186 *N.J.* at 434–35. Thus, the issue of whether a lessee can qualify as a second category consumer has not been resolved by our Court. [7]

We need not address or again resolve the precise issue we addressed in *Ryan, supra,* 376 *N.J. Super.* at 196–99, and the court addressed in *Voelker, supra,* 353 *F.*3d at 524, because in those cases and the others that have addressed the issue, entry into a lease has been uniformly construed as a transfer of the vehicle under section 2301(3) of the MMWA. 15 *U.S.C.A.* § 2301(3). Thus, those cases required only a determination as to whether the transfer of the vehicle otherwise qualified the lessee as a category two consumer.

In contrast, Feng is not a category two consumer because he failed to establish Chee transferred any legally enforceable right to the use or possession of the vehicle. Nor could she have transferred those rights because the retail installment agreement prohibits the assignment of any of her rights to a third-party, including her right to the vehicle's use, possession or ownership.

Lacking any evidence Chee granted Feng any legally enforceable right or interest in the vehicle, we are satisfied the court correctly determined he was not a category two consumer. We reject Feng's contention that Chee's decision to permit him to use the vehicle that she had purchased, without more, constitutes a transfer under section 2301(3) of the MMWA. No legal precedent supports the contention, and acceptance of it would lead to the absurd conclusion that anytime the owner of a vehicle loans it to another, the user becomes a consumer under the MMWA. We find no support in law or logic for such a result.

We next consider whether the court correctly determined plaintiff was not a category three consumer under the MMWA. To qualify as a category three consumer, Feng was required to establish he "is entitled by the terms of such warranty ... or under applicable State law to enforce against the warrantor ... the obligations of the warranty." 15 *U.S.C.A.* § 2301(3). Thus, the inquiry is dependent in part upon Feng's state law claims for breach of express (count two) and implied (count five) warranties, which, as

explained further below, are not viable claims under the facts presented here.

An automobile lessee that is assigned rights to a manufacturer warranty can qualify as a third category consumer under the MMWA. *Ryan, supra,* 186 *N.J.* 435–36. A lessee, "as the assignee of the dealer's warranty, is entitled to enforce the warranty under New Jersey law." *Id.* at 436 (citing *Miller Auto Leasing Co. v. Weinstein,* 189 *N.J. Super.* 543, 546 (Law Div. 1983), *aff'd o.b.,* 193 *N.J. Super.* 328 (App. Div.), *certif. denied,* 97 *N.J.* 676 (1984)).

**\*7** Thus, an assignee of a buyer's rights to a warranty agreement, though not the actual "buyer" within the statutory definition, may nevertheless enforce the warranty agreement in limited circumstances. *Ibid.* Plaintiffs' Affidavit of Sale, however, did not result in an enforceable assignment to Feng of Chee's rights under the warranties because the retail installment contract barred Chee's assignment of her contractual rights, *Somerset Orthopedic Assoc., P.A. v. Horizon Blue Cross and Blue Shield of N.J.,* 345 *N.J. Super.* 410, 415 (App. Div. 2001) (finding specific and express anti-assignment clauses are generally upheld), and Feng provided no other evidence of a valid assignment of Chee's warranty rights.

Nevertheless, Feng argues he is entitled to assert the warranty claims as a third-party beneficiary of the retail installment contract. We disagree. A non-party cannot enforce a contract unless it "clearly appear[s] that the contract was made by the parties with the intention to benefit the third party" and that "the parties to the contract intended to confer upon him the right to enforce it." *First Nat'l State Bank v. Carlyle House, Inc.,* 102 *N.J. Super.* 300, 322 (Ch. Div. 1968), aff'd o.b., 107 *N.J. Super.* 389 (App. Div. 1969), *certif. denied,* 55 *N.J.* 316 (1970). "The contractual intent to recognize a right to performance in the third person is the key." *Broadway Maint. Corp. v. Rutgers,* 90 N.J. 253, 259 (1982).

"When a court determines the existence of 'third-party beneficiary' status, the inquiry 'focuses on whether the parties to the contract intended others to benefit from the existence of the contract, or whether the benefit so derived arises merely as an unintended incident of the agreement.' " *Ross v. Lowitz,* 222 *N.J.* 494, 513 (2015) (quoting *Broadway Maint., supra,* 90 *N.J.* at 259). The rights of a third party beneficiary are determined by

the intention of the parties who actually made the contract. They are the persons who agree upon the promises, the covenants, the guarantees; they are the persons who create the rights and obligations which flow from the contract. ... Thus, the real test is whether the contracting parties intended that a third party should receive a benefit which might be enforced in the courts; and the fact that such a benefit exists, or that the third party is named, is merely evidence of this intention.

[*Ibid.* (quoting *Borough of Brooklawn v. Brooklawn Hous. Corp.*, 124 *N.J.L.* 73, 76–77 (E. & A. 1940)).]

Where there is "no intent to recognize the third party's right to contract performance," the third party is an incidental beneficiary, having no contractual standing. *Ibid.*

We are satisfied the record does not support Feng's claim he is a third-party beneficiary under the retail installment contract. The dealership may have been aware Feng would use the vehicle, but the record is devoid of any evidence showing the dealership or defendant intended "to recognize" a right in Feng to enforce performance of the contract's terms. *Ibid.* Therefore, Feng was not a third-party beneficiary under the retail installment contract.

Feng does not articulate any viable state law claim that would otherwise qualify him as a category three consumer under the MMWA. Although we have recognized that the MMWA effectively removes "the requirement of privity of contract between the consumer and the warrantor," *Ventura v. Ford Motor Corp.*, 180 *N.J. Super.* 45, 59 (App. Div. 1981), the absence of privity in this case would at most allow Feng to pursue personal injury damages, not economic loss damages, as a result of the alleged breach of express or implied warranties. *See Spring Motors Distribs. v. Ford Motor Co.*, 98 N.J. 555 (1985).

*8 A buyer seeking economic loss damages resulting from the purchase of defective goods can maintain an action for breach of express or implied warranties pursuant to the Uniform Commercial Code (UCC), *N.J.S.A.* 12A:1:101 to 12–26. *See Alloway v. Gen. Marine Indus., L.P.*, 149 *N.J.* 620, 627–30 (1997). The UCC "generally applies to parties in privity," but our courts have construed the statute to find that under certain circumstances, the absence of privity is not a

bar to maintain such actions. *Spring Motors, supra,* 98 *N.J.* at 582. For example, the lack of vertical privity amongst parties in a distributive chain, i.e., a supplier, manufacturer, retailer, and ultimate buyer, does not preclude the extension of the supplier's warranties made to the purchaser. *Id.* at 583–84.

However, Feng's issue is one of "horizontal non-privity," or "the relationship between the retailer and someone, other than the buyer, who has used or consumed the goods." *Id.* at 584. A horizontal non-privity plaintiff refers to someone such as the buyer's spouse or child. *Ibid.* The UCC extends warranties horizontally to "any natural person who is in the family or household of [the] buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume, or be affected by the goods and who is injured in person by breach of the warranty." *N.J.S.A.* 12A:2–318 (emphasis added). Thus, the lack of privity in this case would only allow Feng to pursue personal injury claims, not purely economic loss damages. [8]

In sum, Feng failed to demonstrate he is a category three consumer under section 2301(3) of the MMWA, and therefore lacked standing to prosecute violations of the MMWA under count one of the complaint or the claims for breach of express and implied warranty under counts two and five.

Moreover, because Feng was neither party to an enforceable contract providing for the warranties or entitled to assert a claim as a third party beneficiary, the court correctly dismissed his claim under count three for breach of the covenant of good faith and fair dealing. [9] *See Cumberland Farms, Inc. v. New Jersey Dep't of Envtl. Prot.*, 447 *N.J. Super.* 423, 443 (App. Div. 2016) (finding there can be no breach of the covenant of good faith and fair dealing in the absence of a contract), *certif. denied,* ––– *N.J.* –––– (2017).

We also reject Feng's argument that defendant "is equitabl[y] estoppe[d]" from claiming Feng lacked standing by inducing Chee to sign all of the documents related to the vehicles purchase. To establish equitable estoppel, Feng was required to prove that defendant "engaged in conduct, either intentionally or under circumstances that induced reliance." *Knorr v. Smeal*, 178 *N.J.* 169, 178 (2003); *accord Berg v. Christie*, 225 *N.J.* 245, 279 (2016). Feng must also establish defendant made "a

knowing and intentional misrepresentation." *O'Malley v. Dep't of Energy*, 109 *N.J.* 309, 317 (1987); *accord Berg*, *supra*, 225 *N.J.* at 279.

*\*9* Feng presented no evidence and made no allegation that defendant made misrepresentations related to the purchase of the vehicle. The evidence showed Feng was advised he did not qualify for the financing necessary to purchase the vehicle and, in response, his wife Chee purchased the vehicle instead. Contrary to Feng's assertion, there was no evidence supporting his equitable estoppel claim.

### III.

Because we affirm the court's dismissal of Feng's complaint, it is unnecessary to address Feng's challenge to the May 28, 2015 order granting defendant's motion for a protective order limiting plaintiffs' written discovery demands. *See, e.g., Lonegan v. State*, 341 *N.J. Super.* 465, 481 (App. Div. 2001) (appeal of refusal to grant preliminary restraints mooted by substantive determination of merits on appeal), *aff'd*, 176 *N.J.* 2 (2003). In any event, we make the following comments.

The court found plaintiffs' 318 interrogatories and fifty-three document demands were excessive, and granted defendant's motion for a protective order, reasoning that ruling otherwise "would cause defendant to suffer an undue burden." We do not find, and plaintiffs have not established, the court abused its discretion in its well-reasoned decision to limit plaintiffs' demands. *See Spinks v. Twp. of Clinton*, 402 *N.J. Super.* 454, 459 (App. Div. 2008) (explaining an appellate court "defer[s] to the 'trial court's disposition of discovery matters including the formulation of protective orders' " (quoting *Payton v. N.J. Tpk. Auth.*, 148 *N.J.* 524, 559 (1997))).

Last, we decline to address plaintiffs' arguments concerning the administrative dismissal of Chee from the case based on her failure to appear for the court ordered arbitration. The court's July 9, 2015 order dismissing Chee's complaint pursuant to *Rule* 4:21A–4(f) was not listed in plaintiffs' notice of appeal. *See, e.g., 30 River Court, supra,* 383 *N.J. Super.* at 473–74 (refusing to review orders not included in the notice of appeal pursuant to *R.* 2:5–1(f)(3)(i)). Moreover, plaintiffs do not argue the court's dismissal order was entered in error. Plaintiffs challenge only the validity of a letter sent by the court staff to Chee rejecting her request for a trial de novo. The letter is not an order or judgment properly subject of the appellate review. *R.* 2:2–3.

Affirmed.

**All Citations**

Not Reported in A.3d, 2017 WL 2625965

### Footnotes

1   Because plaintiffs share a surname, for ease of reference we respectfully refer to them by their first names.

2   The court recognized that Briglia governs the permissibility of a party's attendance at independent medical examinations, but found its reasoning instructive in the present matter.

3   *See In re Feng Li*, 213 *N.J.* 523 (2013)**.**

4   The affidavit includes factual allegations plaintiffs suggest are relevant here, but the affidavit is not competent evidence of the alleged facts because it was not made upon oath or verification. *R.* 1:4–4; *Alan J. Cornblatt, P.A. v. Barow*, 153 *N.J.* 218, 236–37 (1998) (explaining an affidavit must be confirmed by oath or affirmation of the party making the statements).

5   Plaintiffs' complaint did not allege a violation of New Jersey's Lemon Law, *N.J.S.A.* 56:12–29 to –49. The court, however, liberally read the complaint to allege a violation of the Lemon Law and dismissed the claim. Feng does not challenge the court's ruling on appeal and, in fact, affirmatively states that plaintiffs did not allege a Lemon Law claim. We therefore do not address the court's dismissal of the putative Lemon Law claim. An issue not briefed on appeal is deemed waived. *Jefferson Loan Co. v. Session*, 397 *N.J. Super.* 520, 525 n.4 (App. Div. 2008); *Zavodnick v. Leven*, 340 *N.J. Super.* 94, 103 (App. Div. 2001).

6   Plaintiffs' notice of appeal makes no reference to the July 9, 2015 order. *R.* 2:5–1(f)(3)(A). "[O]nly the orders designated in the notice of appeal ... are subject to the appeal process and review." *W.H. Indus., Inc. v. Fundicao Balancins, Ltda.*, 397 *N.J. Super.* 455, 458 (App. Div. 2008). We therefore do not consider the court's order dismissing Chee's claims. *See,*

    *e.g.*, *30 River Court East Urban Renewal Co. v. Capograsso*, 383 *N.J. Super.* 470, 473–74 (App. Div. 2006) (refusing to review orders not designated in the notice of appeal).

7    As noted in Justice Rivera–Soto's dissent, it is unclear whether the Court's decision to affirm based solely on our determination that the plaintiff qualified as a category three consumer was intended as a rejection of our determination a lessee can be a category two consumer. Justice Rivera–Soto stated that he concurred with the majority to the extent it "disagree[d] with the Appellate Division and conclude[d]" the plaintiff was not a category two consumer. *Ryan*, *supra*, 186 *N.J.* at 437.

8    We also reject Feng's attempt to ignore his lack of third-party beneficiary status by claiming he is the "true owner" of the vehicle. Feng's reliance on *Verriest v. Ina Underwriters Ins. Co.*, 142 *N.J.* 401, 408 (1995), and *Am. Hardware Mut. Ins. Co. v. Muller*, 98 *N.J. Super.* 119, 129 (Ch. Div. 1967), *aff'd o.b.*, 103 *N.J. Super.* 9 (App. Div.), *certif. denied*, 53 *N.J.* 85 (1968), is misplaced. Those cases addressed the issue of vehicle ownership for insurance purposes under the terms of insurance contracts different than the terms of the retail installment contract at issue here.

9    Plaintiff's only remaining claim, asserted in count four, alleged defendant's refusal to honor the warranty agreement violated the the Consumer Fraud Act, (CFA), *N.J.S.A.* 56:8–1 to –20. The court's dismissal of the CFA claim is not challenged in plaintiff's brief on appeal, and therefore Feng's right to challenge the dismissal is waived. *Jefferson Loan Co.*, *supra*, 397 *N.J. Super.* at 525 n.4; *Zavodnick*, *supra*, 340 *N.J. Super.* at 103.

---

End of Document                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.